In the matter of the award of letters of administration of the estate of JOSIAH WALLACE, deceased.

1. Marriage may be proved by the witnesses to its solemnization, or by presumption, from a record of it or from cohabitation and repute, and by declarations or admissions of the parties to it, when against their interest or a part of the *res gestæ,* or by conduct from which such admissions may be implied.

2. To be of evidential value, cohabitation must be with matrimonial habit and repute.

Wallace's Case.

3. When all the kin of an intestate unite in recommending, for appointment as administrators of a solvent estate, strangers to the estate, against whom no disqualifying objections can be made, the court may properly, and ordinarily should, adopt that recommendation.

Josiah Wallace died intestate at Palmyra, in Burlington county, on the 11th of May, 1891, leaving an estate valued at nearly $500,000.   On the 19th of May, in the same year, George D. O'Neil, claiming to be his grandson, caveated against the grant of administration upon his estate.   On the 23d of the same month Ann S. Rudderow, the only sister of the decedent, renounced her right to administer, and asked that William R. Lippincott, Albert C. Heulings and Israel Roberts, one only of whom, William R. Lippincott, is of kin to the decedent, be appointed administrators of the estate in her stead, and a few days later twenty-four of the nephews and nieces of the decedent, children of his deceased brothers and sister, composing all but one or two of their class, asked for the appointment of the same gentlemen.   The right to administration was tried by the orphans court, between George D. O'Neil upon the one part and the sister and nephews and nieces of the decedent on the other part.   The issue was as to the legitimacy of the relationship claimed by O'Neil.   After hearing the evidence offered, the court decided, using the language of its decree, " not to ignore one set of claimants against the other," and proceeded to appoint two disinterested persons administrators.   Upon appeal to the prerogative court, the decree of the orphans court was reversed, administrators of the estate, *pendente lite*, were appointed and the prerogative court proceeded to determine the right of administration upon the evidence produced in the orphans court, and, as well, upon additional proofs taken under its own order.   The present decision determines the right to administration.

*Messrs. Scovel & Harris* and *Mr. Jacob C. Hendrickson*, for George D. O'Neil.

*Mr. Samuel K. Robbins* and *Mr. Charles E. Hendrickson*, for Ann S. Rudderow and others.

Wallace's Case.

THE ORDINARY.

The claim in behalf of the caveator, shortly stated, is this:. On the 20th of June, 1835, Josiah Wallace married a woman named Elizabeth D. Weaver. On the 26th of May, 1836, Elizabeth gave birth to a son, who was called Alphonso. Alphonso married Susan A. Voght in 1859, and, as the fruit of their union, the caveator was born on the 14th of February,. 1860. After the birth of the caveator, who was also named Alphonso, Alphonso, the father, enlisted in 'the army, and for several years disappeared. His wife, being left in destitute circumstances, after three or four years permitted one Daniel O'Neil, of Pittsburg, Pa., to adopt her son, and the boy thereby became known by his adopted father's surname and was given the Christian name George.

The substantial dispute is as to the marriage of Josiah Wallace to Elizabeth D. Weaver. There is so little room to doubt that O'Neil is the legitimate son of Alphonso, and that Alphonso was the natural son of Josiah Wallace, that I assume those conditions to exist without discussing the evidence which has been offered to establish them. The important and chiefly disputed question is, whether Josiah Wallace married the mother of the elder Alphonso, whom I will hereafter refer to simply as Alphonso, styling his son O'Neill, or the caveator.

Josiah Wallace was born in Burlington county in August,. 1802. He was the son of a farmer. As he grew up to manhood he learned the trade of a wheelwright, and for a time pursued that trade at Mount Holly. Some time after 1825—it is not definitely known when—he went to Camden and there followed the same trade, first under a man named Glover and then for himself. He appears to have remained in Camden until early in the year 1836, when he returned to Palmyra and resumed his home with his mother, his father having died in 1832.

The evidence fails to disclose where he resided or what was his method of life, while he worked in Camden, but from his return to Palmyra, in 1836, until his death, in 1891, it exhibits a continued residence among his relatives in Burlington county..

Wallace's Case.

The remembrance of a nephew, who is now upwards of seventy years of age, is, that shortly after Mr. Wallace came back to Palmyra he was arrested and taken to Camden, and that it was then talked in the family that the arrest was upon a charge of bastardy, which the decedent had settled by the payment of money. Another, older, witness also remembers the report that Wallace had some trouble with a woman and had paid her money in settlement of it.

After the decedent's death, there were found in an old chest belonging to him, which had been left in the garret of the house of Elias Morgan, at which he resided some nineteen or twenty years before his death, among some other papers belonging to him, a general release, purporting to be signed by Elizabeth D. Weaver and witnessed by Fred. Tolbert. This document has the appearance of an old paper, and bears date on February 29th, 1836, about three months before the birth of Alphonso. It purports for the consideration of $200 to release Josiah S. Wallace from all claims and demands of Elizabeth D. Weaver, past or present. When it was found there was enclosed in it another apparently old document, in the handwriting of Wallace, of which the following is substantially a copy:

"A COPY OF A LETTER SENT TO E. D. W.

"Miss E. D. W. you seem to give yourself a great deal of unnecessary trouble in riting to me, and of getting others to write, and writing to others that know you not nor care about you. I will name one called Marlinda Howard that is a very able writer (with you at her elbow). I will tell you that she and her dictators are liars and if a man was to tell me as she has wrote and about those or the one that I cherished a sentiment of more than mere friendship for, and are now no more, I would find them out, I would put a ledding ball through their hearts, but as she is a broken down old hag I leave her to welter in her own lies; as she has but a few years in store the Devil will soon get his own. I was told by a friend or enimy of mine that you told him that if I did not come to see you that you would come to see me. You may come and be dambed as soon as you please; Marlinda may come if she will; she will not find old Mr. B. * * * but she will feel a gentlemans foot, and that covered with something hearder than gum elastic. You and Marlinda and all your coleagus may * * * do your worst; you will find me to have a nerve that will never surrender to your hellish desires; you seem to be desirous to let people know that you are mother of what is called by law an illegitimate child, and as the manner is slow, that of sending letters

and the child telling people in the market I will recommend a sucher way; You had better get say one or five hundred hand bill printed, and then send him through all the markets in Philadelphia and distribute them; be shure to have printed in large letters on the bills that I Elizabeth D. Weaver"—

This paper is without date or signature, but from events to which it refers I think, for the reasons I will hereafter state, that it was written in the year 1848.

It is impossible to say, with entire satisfaction, from its appearance alone, that it is an ancient writing. It derives its probative force from the custody from whence it came, the handwriting, its enclosure with the release and its correspondence in statement with facts disclosed by the proofs, to which I will, as I have intimated, hereafter refer. It does not appear that any effort was made to find the subscribing witness to the release or to ascertain if he ever existed. The evidence relied upon to establish it is, that it came from the custody of the decedent, is apparently an old paper and purports, by its date, to have been made more than thirty years ago.

After the return of Wallace to Palmyra, he appears to have adopted the trade of house painter, and to have pursued that trade about Burlington county until 1865. After that year he appears to have had no occupation, except the investment of his growing fortune, which, by close economy and judicious investment, at his death, reached the proportions already stated.

Direct proof, by witnesses, of a marriage between Mr. Wallace and Elizabeth Weaver has not been attempted. The evidence offered to establish it is, proof of cohabitation and repute, and declarations and admissions by word and by conduct.

Where a man and woman constantly live together, ostensibly as man and wife, demeaning themselves towards each other as such, and are received into society and treated by their friends and relations as having and being entitled to that *status*, the law will, in favor of morality and decency, presume that they have been legally married. Such cohabitation and repute is said to be matrimonial, in distinction from that occasional, hidden and limited cohabitation which marks the meretricious relation. It is always a question whether the cohabitation proved is of the

character which will raise a presumption and make *prima facie* proof of marriage. At best, it can do no more, for the presumption may be rebutted. The rule of evidence in this respect is clearly and concisely stated by the present chief-justice, in *Voorhees* v. *Voorhees, 2 Dick. Ch. Rep. 555*, in these words :

"It is to be borne in mind that cohabitation with matrimonial habit and repute is, standing alone, nothing more than testimony in proof of marriage, the conduct of the persons to whom it relates does not constitute marriage, and, consequently, from its evidential mature it is liable to be rebutted by other proofs."

A few expressions of Chief-Justice Agnew, in *Yardley's Case, 75 Pa. St. 207*, will serve to illustrate that which is meant by matrimonial cohabitation. He says :

"But it is a misnomer to call the visits of Howard Yardley to Elizabeth Sithens cohabitation. It was lacking in its chief element, constancy of dwelling together. * * * His visits to her were of an irregular kind, and, though frequent and continued, bore no resemblance to married life." He further says that matrimonial cohabitation is where the parties " have the same habitation, so that where one lives and dwells, there does the other live and dwell always with him."

There is another element necessary to adequate proof of marriage by cohabitation and repute. The repute must be general, extending to the relatives and friends of both parties with whom their daily lives are spent. It must not be divided as though only playing a part in one side of a secretive or double life. Where a man cohabits with a woman of a more humble sphere of life than he customarily moves in, permitting her friends and acquaintances to believe that they are married, but at the same time both he and she refrain from permitting his friends and relatives, with whom he constantly intermingles and lives, to know of the cohabitation and repute, the reputation is divided and correspondingly of less evidential value, for, under particular circumstances, a man, to preserve the good name of his mistress with her relatives and associates, and to subserve his and her conveniences, may be willing that she shall assume among those people a different character from the disgraceful one to

which she really is entitled. *Rose* v. *Clark, 8 Paige 574; Cunningham* v. *Cunningham, 2 Dow 482; Abb. Tr. Ev. 81.*

Another circumstance, appearing in course of the proof of cohabitation and repute, destructive of its value, is where the cohabitation is abruptly terminated and long separation is suffered without pursuit of the man and demand upon him for the support and maintenance which it is the duty of a husband to afford. *Van Buskirk* v. *Claw, 18 Johns. 346; 2 Greenl. Evid. 464.*

Only four witnesses speak of having seen Josiah Wallace and Elizabeth together, and their testimony relates to a period of time comprised within one or two years, twenty-three years after the birth of Alphonso and three or four years before the death of Elizabeth. The widow of Alphonso and mother of the caveator, now the wife of a man named Richards, states that she married Alphonso in January, 1859, and that about two weeks after marriage she and her husband took up their residence with Alphonso's mother. The place of residence was in a small house fronting on a court, in the city of Philadelphia, near Fifth and Christian streets. The house was three stories in height, but had only one room on each floor. Elizabeth lived in the room on the first floor, the second floor was used for storage and the witness and her husband occupied the room at the top of the house. The witness was then sixteen years old. Her testimony is, that she lived with her mother-in-law, as indicated, for two years, and that during the whole, or, at least, a part, of that time she frequently saw Josiah Wallace in Elizabeth's room; that she saw him sleep there with her mother-in-law, and eat there, as though he were her husband, and that her mother-in-law spoke of him as her husband and assumed his name without objection on his part.

Another witness, Hannah Fortner, testifies that Elizabeth Weaver was her father's half-sister, and that, when the witness was about nine years of age, in 1858 or 1859, she used to take Elizabeth, who was so near-sighted that she needed assistance, out to walk; that one time, when she called upon Elizabeth for the purpose of taking her out to walk, she saw a man there, whom

Elizabeth said was Alphonso's father; that, although she fre-
quently visited Elizabeth, this was the only time she saw the
man, and that her father told her that Elizabeth and her husband
did not live together.

Rebecca Benckert was the wife of a huckster, who lived in a
house adjoining that in which Elizabeth lived, for about a year,
in 1859 or 1860. She testified that she used to see a short man
come to see Elizabeth who, at times, brought vegetables and
fruit; that Elizabeth said he was her husband, Mr. Wallace;
that Elizabeth called herself, and was known in the neighbor-
hood in which she lived, as Mrs. Wallace.

The only other witness who testifies to the cohabitation between
Mr. Wallace and Elizabeth is Ellen Norback, a half-sister of
Elizabeth, who has been the inmate of an alms-house and hos-
pital, and suffers from some mental ailment. She admits that
her memory is impaired, but asserts that she recalls that during,
or after, the war, Josiah Wallace was accustomed to come " pretty
often " from New Jersey and visit her sister and stay with her a
few hours, and that both he and Elizabeth, at that time, said
they were husband and wife. Of what time she speaks, it is
difficult to determine. It could not be during the war, because
then Elizabeth was at the house of Mrs. Warrington; nor after
the war, because then Elizabeth was dead ; nor immediately
before the war, because then Alphonso's wife, of whom the
witness says she knows nothing, was in the house with Eliza-
beth. She names the place of residence as at Ninth and Shippen
streets, in Philadelphia, which was neither the place where
Alphonso and his wife lived with Elizabeth nor where Mrs.
Warrington lived. Except by this witness, it has not been
averred that she ever lived at that place.

This is the entire evidence as to cohabitation and repute of
marriage.

There is additional evidence that Elizabeth declared herself
and was known by the name of Wallace. After she left the
court near Christian and Fifth streets, she appears to have taken
up her residence with Mrs. Warrington, who lived in three
or four rooms in a house situate on a small street or alley run-

ning off Christian street, between Eighth and Ninth streets, and
to have been known there as Mrs. Wallace; but it appears that
Josiah Wallace never visited her there. The residence with Mrs.
Warrington was continued from 1861, or thereabouts, until
Elizabeth died, in May, 1864. It also appears that Elizabeth
was buried in a cemetery at Kensington, from Mrs. Warrington's
house, by the name of Elizabeth Wallace. The mother of Mrs.
Richards testifies that she knew Elizabeth as Mrs. Wallace.
These additional proofs, however, of the name by which Eliza-
beth was known, are not connected in any way with Josiah Wal-
lace, and have no probative force beyond that which is to be
accorded to declarations by Elizabeth in her own interest.

Coupled with the proof of cohabitation, and its attendant
shadow, repute, the contemporaneous declarations of parties to it,
not only in the presence of each other but separately, are of
evidential value as affirmatively characterizing the cohabitation.
Among such declarations in the present case the most prominent
appears to be an entry on a sheet from the Bible of Elizabeth,
upon which much reliance is placed by the caveator. The Bible
was produced by Mary Hannold, the daughter of Mrs. Warring-
ton, who says that it was given to her by Elizabeth. In it
appears a detached sheet of paper, upon which there is no print-
ing, and which is similar in size and paper to the remaining
sheets in the book. Upon this sheet appears the following
writing, on the first page of the sheet:

"Born February 14, 1860. Alphonso Walker son of Alphonso and Susan
Wallace, 1860."

"Alphonso R. Wallace the son of Elizabeth and Josiah Wallace was born
May 26th, 1836."

"Mary T. Weaver departed this life January 24th, 1862."

"Elizabeth Wallace departed May 6th, 1864."

The last line is in lead-pencil.

On the second page, or reverse side, of the sheet, this appears:

"June 20th, 1835. By the friends Seremony, Before Samuel Haines Esq.
of Moorestown Josiah Wallace to Elizabeth D. Weaver. Bouth of Burling-
ton County."

"January 29th 1859 by the rev. Mr. Clay of Sweds Church Alphonso Rush
Wallace to Susan Vogt both of Philadelphia."

Mrs. Hannold does not know who made the lead-pencil entry as to the death of Elizabeth, but surmises that it may have been her son, Alphonso, to whom, when he appeared after the war, she entrusted the Bible for a short time. The handwriting of the entries is not proven, nor is it shown when the entries were made. I find, by reading the title page of the book, that it was printed in the year 1845, ten years after the date of the first marriage recorded. I also notice that the entries upon the first page commence with the record of the birth of the caveator in 1860, which is followed by a record of the birth of the elder Alphonso in 1836. This order of entry would indicate that the caveator's birth was first recorded, and that then his father's birth and the subsequent entries were thought of. If that indication be the truth, then the entries were all made in or after the year 1860. If they were made in 1860, during the cohabitation that has been proved, they may possibly be entitled to the respect due to declarations made by one party during the course of cohabitation. They are not, however, entitled to weight as admissions by Josiah Wallace, because there is not a particle of proof that he ever saw either them or the Bible, or that he knew of the existence of either. And they are not entitled to respect as a family record, because there is nothing to show that the Bible ever had place in a family, and because the entries appear to have been made after and not at time of the events they record.

The declaration of marriage between Josiah and Elizabeth, in 1835, excites inquiry why, if it be true, there was no apparent cohabitation from 1835 to 1859. While the proofs of the caveator are silent respecting this period, it is to be remembered that the testimony on the other side is, that Josiah then lived among his kindred, at Palmyra, as a single man, and, more than this, that they establish that during the years 1847 and 1848 he was engaged to be married to a lady of excellent repute, whom he frequently visited until she died in 1848. It is also in evidence, by the testimony of a credible witness, that during the very period covered by the caveator's proofs of cohabitation, Josiah was engaged in painting a house, upon a farm in Burlington county, almost continuously from August, 1859, to January,

1860, except for three weeks in September, when he was sick, and that during that time he occupied the same room and bed as the witness.

But the declaration as to the marriage is, in all probability, false. It states that Josiah and Elizabeth were married by Samuel Haines, of Moorestown, on the 20th of June, 1835, by the Friends' ceremony, and the proofs show that the only Samuel Haines, of Moorestown, died in the year 1833, two years before the alleged marriage, and, as well, that there is no record of such a marriage as the Bible entry asserts, either in the office of the clerk of Burlington county, as the law required there should be if the marriage was solemnized in that county, or with either of the societies of Friends in the county. Besides, after 1835, Elizabeth signed the release to Josiah, not as his wife, but as Elizabeth D. Weaver. The apparent falsity of this declaration naturally leads to belief that the other declarations were false, and designed to give matrimonial character to the cohabitation for some ulterior purpose, and I think there is strength in the insistment that such purpose was to preserve the appearance of morality and decency in order that Elizabeth might retain the companionship of the acquaintances with whom she was surrounded. A question asked of Mrs. Hannold, who produced the Bible, appears to support this conclusion. She was asked whether, while Elizabeth lived with Mrs. Warrington, she made allusion to having been married, and she replied, " No," but that on one occasion when she asked Elizabeth if she were married or a widow, Elizabeth evasively replied that she was not a widow.

It is clear, from all the testimony, that if Josiah visited Elizabeth during the period covered by the caveator's proofs his visits must have been occasional, short, and, so far as his friends and associates were concerned, secret. They clearly did not partake of the matrimonial character. Their repute, given character by insincere declarations, was confined to the narrow circle of Elizabeth's acquaintance. They were abruptly terminated, and although Josiah was of ample means, Elizabeth did not pursue him and demand maintenance as her right, but, in poverty, became dependent upon the charity of Mrs. Warrington.

But the caveator claims that the decedent admitted or declared his marriage after the death of Elizabeth. This proof, I think, is admissible, because such declarations, in view of the attitude of the decedent towards Elizabeth at the close of her life, would appear to be against his interest. They, of course, occurring after Elizabeth's death, cannot be accounted part of the *res gestæ*. In support of this branch of the proof, two witnesses were produced. One of them is James Gracey, who appears to be an illiterate man, nearly seventy years of age, who was engaged in the business of carrying moulding sand by boat to foundries along the Delaware river. Gracey states that in 1889 he met the decedent at the house of William F. Morgan, where decedent lived, and there entered into a long conversation with him, in the course of which he told the decedent that during the late civil war he, Gracey, had been a lieutenant in Company B, of the Forty-fifth Pennsylvania Regiment of Volunteers, to which Mr. Wallace replied that he, Wallace, had had a son in the army, and that his son had either been shot or had died, he could not tell which; that he, Wallace, had married and had had a child, the son in question, and that he had had difficulty with his wife and had paid her money to get rid of her, adding, at the same time, that his son had lately visited him.

That which is narrated by this witness as conversation with Mr. Wallace, touches several mooted questions of fact in the cause in such a manner as to indicate the witness' imperfect conception of them; as though he were artfully attempting to repeat a badly-learned lesson, or, for some other reason, was confused in mind. For instance, the fact is, that during the war it was thought that Alphonso had died of some disease or had been killed, and it is also a fact that after the war that belief was dispelled by his reappearance and repeated visits to Josiah until the year 1876, when he was known to have died in Philadelphia. The witness, in one sentence, says that the decedent stated that his son had been shot or had died during the war, and in another sentence, that he said his son had been to see him, and yet he makes no attempt to reconcile the very apparent conflict in the statements. It appears also, as a fact, that the decedent, at his

death, held the note of William F. Morgan for $10,000. The witness confuses this fact with Mr. Morgan's ownership of a cemetery in Palmyra in his statement that Josiah said, "I hold a note against Mr. Morgan; I have been thinking over cancelling that note and making Mr. Morgan a present of that cemetery for that note I hold agen him."

Upon cross-examination, several days after the direct examination, the witness admitted that he never had been a lieutenant in the Forty-fifth Pennsylvania Regiment, and never was in that regiment at all, and when the question was put to him whether he had not so stated in his previous examination, he answered, "I don't know what I said; I had a little beer in me that day; I don't remember; but that is what I say, I was in the United States service." Upon cross-examination on the day when he was examined in chief, he denied that he had ever been convicted of crime, but on his second or continued cross-examination at a later date, he admitted that he had been convicted for breaking, entry and larceny at Williamsport, Pa., and had served a term of imprisonment in punishment for that crime.

The other witness to Josiah's admission of marriage is Jane Polis. She is an old woman, living at Palmyra. She first stated that, in 1869 or 1870, she visited Mr. Wallace with O'Neil's mother; that Mr. Wallace took the mother in another room and closed the door between them and Jane Polis, but that, nevertheless, the witness heard, through the door, Mrs. Richard's say, "Here is a photograph," and add, that it was the grandson's, and that Josiah Wallace should take it and keep it; and Josiah say, that some day there would be some rusty pennies left to which O'Neil would fall heir providing his father did not turn up.

The mother of O'Neill speaks of this visit to Josiah, but does not refer to Josiah's having said anything about her son's heirship of his money. It is not to be supposed, if such a remark had been made, and she had remembered it, that she would not have repeated it when on the witness stand; and it hardly can be believed that she would have forgotten so important a remark. As to the remark, Jane Polis is without corroboration. On the

contrary, it appears to be very improbable that she could have heard it. In narrating the circumstances surrounding the visit, she says that two daughters of Elias Morgan, in whose house the visit was made, were present, and that they listened at the closed door to overhear what passed between Mr. Wallace and the wife of Alphonso. In this the two daughters contradict her; one of them says, and she is corroborated by her sister, that she was not present at all ; and the other states that no one listened at the door, and that conversation could not be heard through the closed door.

At a later day, in the taking of testimony, Jane Polis was recalled by the caveator, and then testified that about fifteen years before Josiah died she met him at her aunt's, in Palmyra, and there had a conversation with him, in which he admitted that he had got in a scrape with a girl, and, without the knowledge of his family, had married her. The witness adds, that Wallace begged her not to tell about his marriage, and intimated that he would pay her for her silence.

In contradiction of this testimony, Alexander Rhoades, for whom Jane Polis worked in a can factory, testified that Jane told him that Josiah had never said that he had been married, but had told her that he had gotten into trouble with a woman and was obliged to pay her money. And, in addition to the contradiction by Mr. Rhoades, it has been shown by a large number of witnesses that the reputation of Jane Polis for truth and veracity, in the neighborhood in which she lives, is bad.

It thus appears that the existence of these direct admissions, alleged to have been made by Josiah Wallace, depend for their support upon the uncorroborated testimony of witnesses who do not appear to be entitled to the credit which the importance of their statements demands. Not only this, but it is in testimony that Josiah made other declarations and did acts inconsistent with such admissions. On the 2d of January, 1837, he conveyed real estate as an unmarried man. In 1858, he told William R. Hilton that he was too poor to marry. Between 1870 and 1873, he told Thomas Sheppard that he had never been married, but that he had had trouble with a woman. In 1883, he sold

six acres of land to the wife of Joseph Bonser, and, at that time,
being asked if he had a wife, said that he had never had a wife.
And, in 1888, he complained to William R. Hilton that a woman
was troubling him, and added, that he had never been married.

Passing from this question as to verbal admissions, there
remains for consideration the conduct of Josiah, which is claimed
to have been tantamount to implied admission of the legitimacy
of the caveator's claim.

First is the circumstance that Alphonso frequently visited him
and was not repulsed. The evidence is, that he came once or
twice each year, between the close of the war and his death in
1876, but that, while he had no hesitation in announcing himself
as the son of Josiah, Josiah always interviewed him in private,
and never alluded to his visit or acknowledged him as his son.
Usually, at these visits, Josiah would walk away from the house
with Alphonso and speedily bring the interview to an end. The
anxiety to get Alphonso away from the house was so marked
upon one occasion that, although the weather was inclement and
Josiah was then an old man, he did not stop to put on his coat
before taking Alphonso out.

Another circumstance is, that Josiah received the visit of
Alphonso's wife, when she came to him with Jane Polis, about
1869 or 1870, and then took from her a picture of her son, the
caveator, and examined the certificate of her marriage to
Alphonso. And another circumstance urged is, that about a
year before he died he received a visit from the caveator and his
mother, at which he was told that he was the caveator's grand-
father, and made no protest; and as well, also, the circumstance
that he frequently had other private interviews with O'Neil's
mother, at his woods in Palmyra.

It also appears that memoranda were found among his papers
in which he makes mention of Alphonso. Those memoranda are
as follows:

On the back of a bank deposit slip he wrote with pencil, evi-
dently some time in or after the year 1870, the following:

Wallace's Case.

| | | |
|---|---:|---|
| " Si Fredericks | 1000 | |
| " Ann S. Rudderow | 10,000 | |
| " Mary M. Sheppard | 10,000 | |
| " Alphonso W. | 10,000 | |
| " Jo Wallace | 10,000 | |
| " Winfield Rudderow | 5,000 | |
| " S. M. Rudderow | 5,000 | |
| " John Rudderow | 5,000 | In trust |
| " Anna Rudderow | 5,000 | |
| " Terressa Rudderow | 5,000 | |
| " Levinia Rudderow | 5,000 | |
| " Shivers Wallace | 5,000 | |
| " Jack Wallace | 5,000 | |
| " Cad Hale | 5,000 | |
| " George Wallace | 5,000 | |
| " Jane Wallace | 5,000 | |
| " Tom Wallace | 5,000 | |
| " Lem Wall | 5,000 | |
| " William Morgan | 10,000 | |
| | ———115,000 " | |

In his diary of 1862 he wrote, under date of March 26th, "Al—so;" in his diary of 1870, under date of June 15th, the word "Alphonso," and in his diary for the year 1885 the following:

    " Memoranda

        " August 6th, 1802
        " Martha 1812
        " Ann 1816
        " Alphonso 1836
        " last visit in 1—"

And on a blank leaf in a book which belonged to him, he wrote this:

" I left Mr. Stiles July 27th, 1834.
" A. W. came May 26th, 1836.

| | |
|---|---|
| 1861 | 1867 |
| 1836, 5, 26 | 1836 5 26 |
| ——— | ——— |
| 25 | 31 years age |
| 1881 | |
| 1836 | |
| ——— | |
| 45 years of age | |

1836, 5, 26 Alfo born.

| year | mo. | day |
|------|-----|-----|
| 1876 | 5 | 26 |
| 1836 | 5 | 26 |

79  40   ·
45  74

4  34 is difference."

And in another book :

"Alphonso came May 26th, 1836."

William F. Morgan, with whom Josiah lived for the last eighteen years of his life, testifies that he frequently saw Josiah write upon a slate, on which he was accustomed to figure, as though he were making a list of contemplated beneficiaries, and that among the names he wrote was "Alphonso Wallace," to which he invariably added "$10,000." The wife of this witness remembers Josiah's writing on the slate, but her remembrance is that, when he wrote the name of Alphonso, he wrote "Alphonso W." and not Alphonso Wallace.

The testimony of William F. Morgan is somewhat affected by his relation to this case. He was appointed by the orphans court one of the administrators of the estate, and lost that position through the appeal of Mrs. Rudderow and others; and it was after that that he first testified to this remembrance. It is charged, and the course of proofs indicates quite plainly, that he is zealous in behalf of the caveator.

It is observable throughout the memoranda, to which I have made reference, that Josiah never gave Alphonso a surname. On the back of the deposit slip he wrote nineteen names, giving every one a surname except that of Alphonso. In the other memoranda he refers to Alphonso as "A. W.," "Alphonso," "Alfo," and, according to Mrs. Morgan's remembrance, he gave only the initial of the surname in the slate writing that she saw. Thus it appears that in every unquestioned writing he concealed the surname. It is also to be noted that " W " would indicate Weaver as well as it would Wallace.

This branch of the proofs makes it irresistibly clear to my mind that there was a recognized bond of some kind between Josiah and Alphonso, and, at the same time, the memoranda, in which the date of Alphonso's birth is subtracted from various other dates, and the age of Alphonso is subtracted from Josiah's own age, intimates that interest, and, it may be, paternal affection, entered into that bond. But, at the same time, the proofs establish with equal clearness that, whatever the bond was, Josiah was ashamed of it. His secret meetings with Alphonso and Alphonso's wife, and the suppression of Alphonso's surname, and his continued failure to declare the relation which existed between him and Alphonso, and even to refer to Alphonso when conversing with the family in which he resided, although he knew that their curiosity must have been excited by Alphonso's appearance, afford ample proof of this.

Now, what was the bond? Was it that of lawful paternity? I think not. In addition to his failure to acknowledge such bond, his intended legacy to Alphonso is most significant. Out of an estate of nearly half a million of dollars that legacy was never allowed to rise above $10,000. I cannot conceive that a father would thus provide for his only lawful son. It will not do to urge that he may have feared his family, for it must be remembered that he was providing a gift to take effect after his death, when he would be beyond the reach of family clamor and reproach; besides, his invariable apportionment of the same sum to Alphonso, whenever he is mentioned in the memoranda, through a series of years, puts it beyond question that he always considered his apportionment to be the proper and just limit of his bounty. Such stability of purpose excludes the possibility that the quantum of the legacy was the product of fear, for, if fear existed, the amount would vary with the courage of the moment of each writing.

But it is also significant, in this connection, that Alphonso was not always mentioned in the memoranda. Indeed, drafts of three wills were found among Josiah's papers, all written by his own hand, one of them dated in 1837, and the other two dated in

---

Wallace's Case.

---

1842, and in no one of them was reference made either to Alphonso or to his mother.

Upon a careful review of all the evidence offered I have come to the conclusion that it fails to establish a marriage between Josiah Wallace and Elizabeth D. Weaver. I believe that the letter which was folded with the release of 1836 truly discloses the relation that existed between Josiah and Elizabeth. I have referred to the proof that, in 1847 and 1848, Josiah was engaged to marry an estimable woman who died. The proofs also disclose that, shortly after the death of that woman, an anonymous letter reached her mother apprising her that Josiah was the father of a child, and leading her to question him about that fact. Now, I think, when the letter, enclosed with the release, is read in the light of this fact, a credible explanation of most of it is had, truly exhibiting the exact relation between Josiah and Elizabeth. It is noted that it is addressed to "Miss E. D. W.," the initials of Elizabeth D. Weaver; that it accuses her of writing to others than himself, and in some way reflecting upon "the one" for whom he "cherished a sentiment of more than mere friendship" and who was then "no more;" that it alludes to a threatened visit from Elizabeth; that he challenged her to do her worst; that he upbraided her for a desire to publish that she was the mother of an illegitimate child, and that he spoke of that child as a boy able to carry handbills through the markets of Philadelphia. If it was written in 1848, upon the provocation which the anonymous letter evoked, there was then a writing to others than himself; there had then been one for whom he cherished a sentiment of more than mere friendship who was dead, and there was a boy twelve years of age who could publish his mother's shame in the markets.

But a moment's consideration of each portion of the proofs exhibits the complete natural and easy accord of the portion considered with meretricious relationship and the existence of its illegitimate fruit. This accord is too apt and conspicuous to be disregarded or mistaken, even under the influence of the inference and presumptions which the law favors in behalf of morality and decency.

The caveator is not entitled to administration.

If it shall be made to appear that it is the unanimous wish of those who are entitled to distributive shares in the estate of Josiah Wallace that Messrs. Lippincott, Heulings and Roberts shall be appointed the administrators of the estate, I will appoint them. I understand that all the distributees, with the exception of one or two, have already expressed this wish. But if this desire is not unanimous, and some of the kin, well qualified to discharge the duties of the office of administrator, desire to be appointed, I cannot disregard them for strangers. *Rinehart* v. *Rinehart, 12 C. E. Gr. 475.* The right of the next of kin to administration is personal. *Cresse's Case, 1 Stew. Eq. 236.* It may be renounced, but it cannot be assigned or transferred. Hence, the majority cannot demand the appointment of strangers. But if there be a conflict between several of the kin possessing equal rights and qualifications, the court will generally, though not necessarily, be controlled in its selection by the wishes of the majority of the kin who are interested in the proper settlement of the estate. *Cramer* v. *Sharp, 4 Dick. Ch. Rep. 558.* And when all the kin unite in recommending strangers, against whom no disqualifying objection can be made, the court may properly, and ordinarily should, adopt the recommendation and appoint such strangers.