## MAY L. ROBINSON

### *v.*

### CURTIS E. ROBINSON *et al.*

*Opinion filed December 20, 1900.*

1. MARRIAGE—*assumption of marriage status is essential to common law marriage.* Parties capable of contracting marriage may enter into a present contract to accept each other as husband and wife; but it is essential to the validity of such a marriage that the parties assume the marriage status.

2. SAME—*cohabitation as husband and wife means dwelling together.* The cohabitation of a man and woman as husband and wife means dwelling together, and not a habit of visiting each other, however frequent.

3. SAME—*meretricious relation is presumed to continue as such.* If the relation between parties to an alleged common law marriage was immoral and meretricious in its inception, and so continued for a considerable period, it will be presumed to continue to be of such a character unless there is proof of change to a lawful relation.

4. EVIDENCE—*acts and declarations during time of alleged marriage are part of res gestæ.* The acts, declarations and conduct of the parties during the time a marriage relation is claimed to exist are competent as part of the *res gestæ*, as showing how the parties regarded each other.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

S. P. SHOPE, LAWRENCE P. BOYLE, and C. STUART BEATTIE, for plaintiff in error:

When parties come together and agree by a present contract to accept each other as husband and wife and enter into the marriage relation, such a contract will be valid and lawful, although not solemnized according to the provisions of the statute. The relation between the parties is always a matter of evidence, and may be proved by records or any other evidence sufficient to establish the fact; and if it is shown that parties intending marriage have accepted each other as husband and wife, the

contract will be enforced. *Elzas* v. *Elzas,* 171 Ill. 634; *Port* v. *Port,* 70 id. 484.

Such a marriage is as good between kindred disreputables as between other people. *Elzas* v. *Elzas,* 171 Ill. 634.

To presume a marriage from cohabitation and repute is one thing; to know it from circumstantial evidence as a fact is another thing. *Lowery* v. *People,* 172 Ill. 466.

When the intent and conduct of the parties tend to prove marriage, consent is presumed. Bishop on Marriage, Divorce and Separation, sec. 975; *Tetter* v. *Tetter,* 101 Ind. 129; *In re Hulet's Estate,* 69 N. W. Rep. 61; *Port* v. *Port,* 70 Ill. 484.

Marriage as a fact being shown, the good faith of the parties is practically beyond question. *Gaines* v. *New Orleans,* 6 Wall. 642.

Testimony of a witness as to a marriage ceremony or agreement is corroborated by proof of subsequent statements by the parties admitting the marriage relation to different persons. *Gaines* v. *New Orleans,* 6 Wall. 642.

The Supreme Court reviews law and fact in chancery cases in *Bliss* v. *Seaman,* 165 Ill. 422, and *Tanton* v. *Keller,* 167 id. 129.

The Supreme Court will give great weight to the finding of the chancellor on conflicting testimony and will affirm his decree unless the error in the facts is clear and palpable, yet the exception is always a part of the rule. *Gould* v. *Warne,* 149 Ill. 108; *Gerber* v. *Gerber,* 155 id. 220; *Goelz* v. *Goelz,* 157 id. 33; *Brown* v. *Holzman,* id. 157.

The decree will be reversed if by the proofs appearing in the record it is not justified. (*Smith* v. *Smith,* 85 Ill. 189; *Lilly* v. *Wagoner,* 27 id. 395.) Or if it is clear the court misconceived the character of the evidence. *Harmon* v. *Thornton,* 2 Scam. 295.

Trial courts have no right to arbitrarily reject the testimony of unimpeached witnesses simply because they wish to find against their evidence. *Railroad Co.* v. *Coultas,* 67 Ill. 404.

IVES, MASON & WYMAN, for defendants in error:

The presence of marital cohabitation and reputation, as well as the usual shadows and circumstances attendant 'upon the married state, is important, if not absolutely essential, where no satisfactory direct evidence of the contract exists. 1 Bishop on Marriage, Divorce and Separation, sec. 953; *Laurence* v. *Laurence*, 164 Ill. 367.

To cohabit means to dwell with some one—not merely to visit or see that one. Anderson's Law Dic. 191; *Calef* v. *Calef*, 54 Me. 366; *Jones* v. *Commonwealth*, 80 Va. 20.

The legal idea of cohabitation of a man and woman as husband and wife is that which carries with it the natural belief that it results from marriage only. It is not a sojourn or a habit of visiting. Anderson's Law Dic. 191; 3 Am. & Eng. Ency. of Law, 308; *Yardley's Estate*, 75 Pa. 211; *Sullivan* v. *State*, 32 Ark. 187; *Bush* v. *State*, 37 id. 215; *Brinckle* v. *Brinckle*, 12 Phil. 232.

A habit of visiting, or an irregular or inconstant cohabitation, raises no presumption of marriage and is not an element in the proof of marriage. *Yardley's Estate*, 75 Pa. 211; *Brinkley* v. *Brinkley*, 50 N. Y. 134; *Hynes* v. *McDermott*, 91 id. 459; *Teter* v. *Teter*, 88 Ind. 498; *Appeal of Reading Fire Ins. Co.* 113 Pa. St. 208; 1 Wharton on Evidence, secs. 84, 85; *Sharon* v. *Sharon*, 75 Cal. 1.

Evidence of declarations made by a person since dead, being liable to abuse, is to be received with great caution and carefully scrutinized. *Laurence* v. *Laurence*, 164 Ill. 367; 18 Am. & Eng. Ency. of Law, (1st ed.) 264, note 7, and cases cited; 1 Taylor on Evidence, sec. 583; 1 Greenleaf on Evidence, (15th ed.) sec. 200; 1 Phillips on Evidence, 205, 206; *Bragg* v. *Geddes*, 93 Ill. 39.

The finding of the court is to be regarded with the same favor as the verdict of a jury, and the same presumptions will be indulged in order to support it, and unless the finding is manifestly against the weight of the evidence the finding will not be disturbed. *Alexander* v. *Alexander*, 52 Ill. App. 199; *Brown* v. *Tile Co.* 32 id. 652.

In chancery cases the chancellor is the judge of the weight of the evidence and of the ultimate facts established by it. *Guild* v. *Hull*, 127 Ill. 523.

If the evidence is irreconcilably conflicting the court will not interfere until it can be seen that the finding is clearly wrong. Mere doubts as to the preponderance will not be sufficient. The court must feel that it will be inequitable to render a decree according to the finding before it will be set aside. *Smith* v. *Newton*, 84 Ill. 17.

Where there is as clear and glaring a conflict in the evidence upon the main question in the case as is presented by this record, it is no part of the duty of an appellate court to disturb the finding of the circuit court. *Stampofski* v. *Steffens*, 79 Ill. 303.

A man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; may, in order to gratify her, hold himself out to her acquaintances as her husband; may be a constant visitor and often eat and sleep at her house; may recognize the fruit of the connection as his children and manifest affection for them, and yet the evidence may fall far short of that which ought to satisfy the mind that there was an actual agreement to form the relation of husband and wife. *McKenna* v. *McKenna*, 180 Ill. 587; Bishop on Marriage, Divorce and Separation, chaps. 14, 15; *Becking's Appeal*, 2 Brewst. 202.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On December 21, 1892, plaintiff in error, who up to about that time had been known as Miss May L. Wilson, filed her petition, under oath, in the superior court of Cook county, alleging that she was lawfully married to Curtis E. Robinson on September 15, 1891; that said Curtis E. Robinson was seized in fee of certain real estate known as 2018 Dearborn street, Chicago, with a dwelling

house thereon, occupied by them as their homestead; that he died April 20, 1892, leaving petitioner his widow, and Curtis E. Robinson, Jr., Martha J. Robinson and Bessie L. Robinson, with a Robinson whose first name was unknown, his children and heirs-at-law. She prayed for an assignment of dower and an injunction against interference with her homestead until dower was assigned. The petition was subsequently amended by including a large amount of real estate of which Curtis E. Robinson died seized, and making additional parties defendants. The answers denied the marriage, and the issue came on for hearing in the superior court in June, 1894, when the court found against the petitioner and dismissed the petition at her cost. The writ of error in this case has been sued out from this court to review the record of that proceeding.

The controversy between the parties is whether the petitioner was the wife and is the widow of Curtis E. Robinson, and it is to be settled as a question of fact from the evidence produced at the hearing, which was substantially as follows: Curtis E. Robinson had lived with his former wife, Johanna, and their children, on Wabash evenue, in Chicago, for several years before her death. He and Johanna had formerly carried on a saloon and house of prostitution on South Clark street, in that city, and had accumulated a large amount of property, but had quit that business. Johanna died April 13, 1891, and after her death Robinson, who was well advanced in years, began to drink heavily, and during the remainder of his life was much of the time under the influence of intoxicants. In the spring of 1891 the petitioner, May L. Wilson, was keeping a house of prostitution at 1209 Michigan avenue, and Robinson then commenced to visit her at that place. As early as June he was frequently at the house and the parties had assumed immoral and meretricious relations with each other. Robinson had a good many buildings which were rented to and occupied

by disreputable persons for business similar to that of petitioner, and he was building a house to be occupied by her at 2018 South Dearborn street. About the first of September, 1891, he rented this house to her for $250 per month to carry on the business in which she was engaged, and she went into possession of the premises as his tenant and conducted the house under the name of May L. Wilson. Robinson continued to be a visitor at·that house in the same manner and for the same purpose as before. There is no evidence tending in any degree to show a change in the relation of the parties on September 15, 1891,—the date of the alleged marriage sworn to by petitioner in her petition,—nor at any time up to November 21, 1891. Petitioner had a daughter, Bessie Galbraith, about fourteen years of age, who testified that Robinson told her before that time that he and mama were going to get married, and that when she came home from school she would live with them and his daughter, Bessie. She said that her mother wanted to send her to a convent, but Robinson discountenanced the project and recommended a school at Morgan Park, and she was sent to the Morgan Park school in August, 1891. This evidence had no tendency to prove a marriage at the time alleged in the petition.

The petitioner, however, claimed at the hearing that a marriage contract was made between her and Robinson on November 21, 1891, and that claim rests upon the testimony of one Vivian Thorpe to the making of the alleged contract and testimony as to subsequent conduct and declarations of Robinson. The woman Vivian Thorpe testified that she was the house-keeper in the disreputable resort at 2018 Dearborn street, and came there in September, 1891, and that Robinson was about the house daily. She attended to the business of the house, and according to her account, in the latter part of November, three or four days before Thanksgiving, she was in petitioner's room with some unknown man that she never saw after-

ward, when petitioner came in and seemed to be angry and Robinson was following her. Petitioner said: "I am sick and tired of it. This man has been fooling me, and I am tired of it." He told petitioner to keep cool, and she said that he promised to marry her and was just fooling her and she was tired of it, and he said, "If you will keep cool I will marry you and make you my wife right here." She said, "Do you mean it?" He said, "Yes." He put out his hand and she put out her hand into his, and witness said, "Now have a kiss on that," and they did so. The unknown man had left the house in the interim. She further said that during this ceremony Robinson said he did not believe in ministers, and that he wanted to keep it quiet just as much as he could until after awhile; that after that time he took full control of the house and ordered groceries for it, and counted the empty wine bottles in the morning at nine o'clock, and she would give the money collected for wines to him; that he said he did not want his family to catch on to his staying over there, as it would make a row at the house. A plain gold ring was produced at the hearing, engraved on the inside: "To my wife, November 25, 1891.—C. E. Robinson." Vivian Thorpe testified that Robinson called her attention to this ring which he had given petitioner, who took it off her finger and showed it to the witness, and that Robinson put it on her finger again and told her to keep it on. She professed to identify the ring produced at the trial as the same one.

In considering the evidence of this witness very many contradictions and inconsistencies will be found. She said the marriage was to be kept secret, and yet according to her testimony she did not observe the agreement but spoke of it to different people. This statement, however, is rendered very doubtful by the fact that when asked who these people were she could not name any one, but said that she spoke of it to persons who wanted to speak of it and who spoke of it first. As all the par-

ties agree that if there was a marriage ceremony it was a secret one, to which she was the only witness, and petitioner never made it public, it is remarkable that she should have told of the ceremony to various people who spoke to her about it first. In testifying about the ring she said at first that there was some writing or something in the ring, but she did not remember what it was, and afterwards she said that the particular inscription was in the ring when she first saw it, because she took particular notice of it, and that it said, "To my wife," and his name. She said that when Robinson and petitioner were alone he always addressed her as Mrs. Robinson, and in answer to the next question said she never heard him address her. She testified that before the marriage Robinson was seldom in the house, in contradiction to her own testimony in another place that he had been there every night and day. She also said at one time that Robinson began staying there part of the night and sometimes all night after this ceremony, and again said that he did not stay there all night after the marriage but would be sure to go home early, so that his family would not catch on. Again, she was contradicted by other testimony for petitioner. As to her turning over the money to Robinson in the morning, the cook testified to his counting the empty beer and wine bottles but testified that she never saw any money paid over to him, but knew lots of times when it was turned over to "Miss May," the petitioner. All the other testimony in the case was that Robinson was at the house very frequently, both before and after the marriage, and apparently in precisely the same relation. There was some further evidence about the ring. The colored cook, who could not read or write, testified that Robinson called her attention to a ring which he said he had given May, but she could not tell about any engraving, and she outdid the witness Thorpe by adding a diamond ring which Thorpe does not appear to have known about. The engraving in the ring

is a sort of evidence very easily manufactured, and its authenticity rests upon the testimony of the woman Thorpe, as the cook could not read anything. A reading of the testimony of Vivian Thorpe creates the impression that it is entitled to very little weight, even when other facts are not considered which, it will be seen, greatly affect the probability of her story.

It is the law of this State that if parties capable of contracting marriage enter into a present contract to accept each other as husband and wife, and they assume the marriage relation, the contract is valid and lawful. (*Port* v. *Port*, 70 Ill. 484; *Laurence* v. *Laurence*, 164 id. 367; *Elzas* v. *Elzas*, 171 id. 632.) It is essential to the validity of such a marriage that the parties shall assume the marriage status. (*McKenna* v. *McKenna*, 180 Ill. 577.) The common usages of society and the conduct of persons toward each other in that relation very generally furnish a test of its existence. The fact of a marriage between two persons of which we have no personal knowledge is inferred from their acts, conduct and declarations. Common experience and observation of the usages and habits of married life show that a certain course of conduct is practically universal in that relation. During the time the relation is claimed to exist, the acts, declarations and conduct of the parties are a part of the *res gestæ*, as showing how they regarded each other, and we held it admissible as such in *Laurence* v. *Laurence, supra.* There was evidence for the petitioner of alleged declarations and conduct of Robinson tending to prove a marriage between him and petitioner, and we are asked to infer the fact of marriage from such evidence in addition to the testimony of the witness Thorpe. This evidence was met by other testimony inconsistent with the existence of a marriage. So far as the public was concerned, there were none of the usual accompaniments of the marriage status and nothing to create the reputation that these parties were in fact married. The cohabitation of a man

and woman as husband and wife means dwelling together, and not a habit of visiting each other, however frequent. It is the living together in the usual manner resulting from marriage, and the evidence in this case shows that petitioner maintained her establishment on Dearborn street and that Robinson had his house, home and family on Wabash avenue. He never had a trunk or his clothing or any of his belongings at her place, and it was never in any sense his home or dwelling place. Neither was his home her home. So far as petitioner is concerned, there is neither conduct nor declaration, during the period of the alleged marriage, that she regarded her relation with Robinson as matrimonial. There was nothing that she ever did or said at any time or place which would justify an inference that she regarded Robinson as her husband. On the other hand, there was evidence of acts and declarations afterward on her part utterly inconsistent with the claim of a marriage. The doctor who attended Robinson in his last illness was called on the morning of his death from Robinson's house to see petitioner. He found her in an excited condition and prescribed for her nervousness, and testified that she told him she had been especially unfortunate in these things; that previous to the death of Robinson she had a friend whom she hoped to make her husband and he died before the marriage; that now she had lost another friend; that she expected to marry Robinson; that the time for the marriage was a few weeks in the future, or in June, and that it was especially a great loss to her his dying so soon, and that after their marriage they were to have had a wedding trip abroad. His attorney testified that after Robinson's death she came to his office and introduced herself as Miss Wilson, and talked about the lease of the property that she was occupying. She did not assume the name of Robinson, or make any claim to any person that she had been married or that she was Robinson's widow, until about the time that she

filed this petition in the following December,—about
eight months after his death. During that time she paid
rent of the house regularly and took receipts running to
May L. Wilson. She was called to explain these mat-
ters, and said that she paid rent because she was told
that the estate was in the hands of the court and all
parties were compelled to pay rent; that she told the
doctor in her grief that she had lost her husband,—her
best and only friend on earth; that when she went to the
attorney's office she did not introduce herself, but asked
about the May Wilson lease. Even if she was correct
about those things, the fact remains that she did not as-
sume the name or claim to be the widow of the deceased
or to have any interest in the estate. It is averred as a
reason for her not assuming his name in his lifetime that
he wanted to keep it quiet; but that reason could have
no operation after his death, when all her interest de-
manded that she should make the relation public. Rob-
inson was a rich man, and it cannot be believed that
petitioner did not know a widow would have valuable
property rights in his estate and make her claim to
them, while she never intimated her claim that she was
a wife or widow until eight months after his death.

The only one of the parties as to whom there was
evidence or declarations tending to prove a marriage was
Robinson. As already stated, there was testimony that
he took an active part in running the resort kept by
petitioner; that he furnished supplies and looked after
the receipts. The testimony of Vivian Thorpe that she
turned over the receipts to him is not in harmony with
that of the colored cook. This cook said that he was the
boss of the house and paid her wages a good many times,
but she dated his assumption of that relation back with-
in two or three weeks of the time she came to the house
on Michigan avenue,—long before the alleged marriage.
This cook testified that Robinson took breakfast there
often and was there late at night, and stayed all night

several times, occupying the room with petitioner. The daughter, Bessie Galbraith, testified that Robinson and her mother came to the school in Morgan Park in December, and he told her they were married and requested her to call him papa, and that she should come home when school was out and have a nice home. W. W. Charles, a money lender, said that Robinson came to his office about the holidays of 1891 and 1892 and introduced petitioner as Mrs. Robinson and wanted him to find a purchaser for the contents of the house, but told him that if he went there to ask for Miss Wilson. Martin Davis, a saloon-keeper, testified that a man left $500 with him one night because he did not want to carry so much money on a night carousal, and the next morning a colored man came in with an order to pay May Wilson $50 or $60 of that money, and the saloon-keeper refused. Robinson came down in the afternoon to get the money, and asked Davis why in hell he did not pay the order; that he sent for the money, and he said, "Miss Wilson and me are married, and what is hers is mine and what is mine is hers;" that every one did not know it at that time, but it was only a question of time when they would. He got the money and they had a drink or two at the time, and the witness said that he may have been drinking but was not intoxicated. What Robinson said at that time had a motive behind it. He was trying to get money on an order given by the depositor which Davis would not pay to petitioner, and it is to be noted that Robinson spoke of her as Miss Wilson. He could only get the money by representing himself to be personally interested. J. Krebbs, a doctor, testified that he treated petitioner in December, 1891, and performed a surgical operation upon her, when Robinson told him she was his wife; that he did not want it generally known, as his folks would raise hell with him, and for that reason he did not want the witness to say anything about it; that he hated to lose her; that he had lost a woman a short time before and

he would hate to lose this one.   In the following March he asked Robinson why he did not change the door-plate, and Robinson said that she expected to continue the business and they thought it better to continue in that name; that after she got well he would get her out of there and they would lead a private life.   The witness said that Robinson called the petitioner Miss May, and the charge for .services was made against her as Miss May Wilson.   Robinson had a large number of houses occupied by tenants, and J. Q. Grant, a constable, was usually employed when an officer was required to execute distress warrants.   Grant testified for petitioner that when she would get behind with her rent Robinson would sign and issue a distress warrant against her.   When one was issued the witness got some boys to go with him as custodians and prepared to throw petitioner out of the house, but when it came to doing it Robinson said it would not do; it would expose something he did not want exposed.   The constable insisted upon going on and asked Robinson to let him throw her out and make some money for Christmas, and Robinson said she was his wife, or something like that.   On another occasion, when he had a distress warrant and had wagons and men ready to take the goods out and store them in a warehouse, Robinson said it would not do; that he was going to build a house down in the country and take petitioner away from his children.   Witness then said, "Why don't you get married and be done with it?" and Robinson said, "I don't believe in marriage."   He said if people lived together and loved each other that was all that was necessary.   Robinson sent his coachman to take petitioner to the dressmaker or some other place several times, and told him to go down and take Miss Wilson out.

As against this testimony, the same doctor. before referred to, (James H. Bates,) who had been the family physician of Robinson for eighteen years, testified that he was called to see petitioner in the latter part of 1891

or beginning of 1892; that when he came into her room he found Robinson sitting there with a sort of woolen bath-robe or night-robe on, with a hood over his head, sitting in a chair, smoking. Robinson was abashed at his finding him there, and afterwards told the doctor that he slipped in on him that day; that he did not intend the doctor to see him, and that he had been there before when the doctor made a previous visit, but that he escaped. The doctor expressed his surprise, and told Robinson that he had children whom he was endeavoring to raise respectably; that those people were usually after something more than a person's visits, and that it might result in something more serious,—something matrimonial, or that kind. Robinson replied: "You need not be alarmed. I am not going to be caught by a sun-fish." Robinson's house-keeper testified that in his last illness he told her that if a light-haired woman came to the door, not to let her in; that her name was Wilson. There was testimony of a young lady, Frances O. Brown, who had been employed in a grocery store on Twenty-first street, that Robinson was engaged to marry her at the time of his death; that he had solicited her to marry him and that she had accepted, but insisted upon his waiting until his wife had been dead a year, and Robinson assured her that he had no relations and was under no obligations to any other woman. The brother-in-law of this witness, John L. Dietrich, who kept the grocery store where the young woman was employed, testified that he had seen Robinson with petitioner in a sleigh on Michigan avenue, and he called him to account for being seen with such a woman; that Robinson called petitioner a bad name, and said she asked him for a ride and he gave her one; that she was one of his tenants, and there was nothing in it. Robinson's children and house-keeper testified that he was at home on Wabash avenue usually in the evening, or at the A. P. A. lodge to which he belonged; that he never was out all night more than twice,

and rarely stayed out until twelve o'clock, and never that late unless he was drunk. There was evidence that before he died he executed a distress warrant against petitioner, which it was intended to execute but for his death.

In the beginning, the relation between Robinson and petitioner was immoral and meretricious and so continued for a considerable period, and it is presumed to continue of the same character unless there is proof of a change to a lawful and matrimonial relation. (*Elzas* v. *Elzas, supra.*) Considering all the testimony, it does not show there was a marriage, but ràther establishes the fact that there was none. The testimony of Vivian Thorpe that Robinson ran the resort and received the proceeds, and that of the cook that he was the boss and took charge of the house, is inconsistent with the undisputed evidence that the rent was paid to him by petitioner, and that in case she got behind a warrant was issued and collection enforced. If he had been running the house this would not and could not have happened. If petitioner and Robinson were married and he was running the business, or they were running it jointly, it would be incredible that every time she owed a month's rent he should issue a distress warrant and employ a constable to set her and her effects out of the house, and only weaken at the last minute through fear of an exposure of some kind. It was only through fear of some exposure that the warrants were not executed and the rent was collected in some other way, but surely he would not so conduct himself toward his lawful wife. One cannot imagine a husband as wealthy as Robinson issuing distress warrants against his wife whom he would so hate to lose, and planning to levy on her goods and eject her from their home. It is impossible to reconcile the conduct of the parties with any idea of marriage between them, but the conclusion is irresistible that they regarded their relation at the last as they had at first. The bill sworn to by the peti-

tioner says that the marriage took place September 15, 1891, and the only evidence relied upon contradicts the averment and fixes the time more than two months later. If something occurred at that time of a similar nature to that testified to by the witness Thorpe, it seems clear that the parties did not themselves regard it as a contract of marriage, and that they did not, either of them, intend to enter into the marriage relation at that time. If they had any such contract they never assumed the marriage status. Their conduct shows that they did not regard themselves as married.

We are satisfied that the chancellor was right, and the decree is affirmed.                *Decree affirmed.*