## SEVERANCE *v.* SEVERANCE.

MARRIAGE—COMMON-LAW MARRIAGE—CONSUMMATION.

A valid common-law marriage is created where a man obtains a marriage certificate, shows it to a woman, says it is too late to get a minister and that they will come back later, to which she agrees, takes her to his father's home, and introduces her as his wife, tells her that a ceremony is unnecessary, lives with her several years, and they are regarded by those with whom they associate as husband and wife, and there is no legal impediment to a marriage.[1]

---

[1] On effect of statute on validity of common-law marriage, see note in 2 L. R. A. (N. S.) 353; 15 L. R. A. (N. S.) 463; L. R. A. 1915E, 68.

Appeal from Wayne; Mandell, J. Submitted June 21, 1917. (Docket No. 118.) Decided July 26, 1917.

Bill by Kathryen Severance against George W. Severance and another for the affirmance of a common-law marriage. From a decree for plaintiff defendants appeal. Affirmed.

*Robert M. Drysdale,* for plaintiff.

*McHugh & Lee,* for defendants.

MOORE, J. This case is a bill in chancery filed under section 8619, 3 Comp. Laws (section 11456, 4 How. Stat. [2d Ed.], 3 Comp. Laws 1915, § 11395), for the affirmance of a common-law marriage. The statute reads as follows:

"When the validity of any marriage shall be denied or doubted by either of the parties, the other party may file a bill or petition in the manner aforesaid, for affirming the marriage; and upon due proof of the validity thereof, it shall be declared valid by a decree or sentence of the court; and such decree, unless reversed on appeal, shall be conclusive upon all persons concerned."

It is the claim of the plaintiff that in 1909 she and defendant Severance contracted a common-law marriage and lived together several years as husband and wife. It is her further claim that when she learned her husband was paying attention to the other defendant that she interviewed Miss Douglas and informed her that Mr. Severance was the husband of plaintiff; that, notwithstanding said notice, later the defendants had a marriage ceremony performed. The case was tried in open court. At the close of the testimony the trial judge expressed himself as follows:

"The testimony of defendant George Severance is not worthy of credence or belief, and that on the evening of January 2, 1909, Kathryen Severance and

George W. Severance entered into a present mutual agreement to take each other for husband and wife, and that this agreement was consummated by George Severance taking Kathryen on that night to the home of his own father and mother and introducing her and living there with her as his wife, and that his family accepted her as such, and that defendant's own mother treated plaintiff as her daughter, and that this relation continued unquestioned for several years until the marriage ceremony of George Severance and Winifred; that after the marriage ceremony of George Severance and Winifred became known to plaintiff, it might be that she did make requests that a ceremony be performed, but this would be only natural in view of the difficulties that had arisen. But the marriage agreement having been made and consummated on January 2, 1909, it became a binding marriage from that time, and whatever might have been said or done by the parties since that time would not have the effect of invalidating the marriage already performed."

A decree was entered accordingly. The case is brought here by appeal.

It is contended by the appellant that the parties became unduly intimate, and that their relations were illicit, and that plaintiff did not rely upon the common-law marriage. We quote from the summing up of counsel for appellant in his brief:

"The finding of facts of the trial judge is full of commiseration for Kathryen and contempt for George, and overlooks entirely the very important fact that the plaintiff did not rely upon the alleged agreement of January 2, 1909, but on January 3, 1909, the very next day, she insisted upon the performance of a marriage ceremony.

"We agree with counsel for the plaintiff when he states in his brief:

"(1) That in this State a marriage ceremony is not necessary to effect a valid marriage.

"(2) That in this State a valid marriage is effected by a present mutual agreement of marriage consummated by cohabitation as husband and wife.

"(3) That such a marriage is binding upon the

parties, and subjects them and others to the obligations thereof, and to legal penalties for a disregard of its obligations.

"But we will qualify his fourth conclusion by saying that the marriage contract will be inferred from the subsequent acts of the parties only when it is not denied by either of them.

"The testimony in this case does not show a present mutual contract of marriage, and neither sympathy for the woman nor contempt for the man can make one."

We shall not attempt to make a detailed statement of the testimony, which runs through a record of nearly 140 printed pages. We quote briefly from the testimony of the plaintiff:

"*A*. He said we would get married.

"*Q*. He said you would?

"*A*. Yes, sir.

"*Q*. Did you make arrangements?

"*A*. Yes, sir. He told me to go to his home Saturday afternoon and meet him there. He was living with a cousin, but I was to meet him at his mother's home, on Hibbard, 337½. He told me to bring my grip. I went to his home, I don't know what they told him, but when I got in there they congratulated us on our marriage; his mother and sister congratulated me on our marriage when I arrived there. We had a little dinner there that night. Mr. Severance came home from work, and we went to Windsor after dinner. He got a marriage certificate in Windsor; I don't recollect the name of the place, but I could find it, I waited for him in a little vestibule. I stayed inside quite a while. When he came back he said he had a certificate; he showed it to me and gave it to me; he said he found out it was too late to get a preacher. He said we would skip over the next day; those are the words he used. We returned to Detroit. We were very quiet coming over until we reached Detroit, and we were standing on Woodward avenue. It was quite cold waiting for a car, and he was telling me his business affairs, and he said, 'From now on we are husband and wife'; those are the words he used. That night he said a ceremony was not neces-

sary.    He said, 'Our marriage is as binding as all the ministers in Detroit could make it,' and I believed him.    He said from then on we would be husband and wife, and I believed it, and have ever since.    Then he took me to his home, his mother's and father's home. I stayed there that night, and his mother was there and father and his sister and two brothers and sister and husband.    I went in their family, and was always accepted as his wife, and they always received me as such.    I think he told them that we had been married before."

Defendant testified in part as follows:

"I recollect the instance leading up to our trip to Windsor.    It was in the fall of 1907, I think.    We made the trip to Windsor the 2d day of January.    I don't remember whether 1908 or 1909.    It was about seven months prior to the birth of Dwight.    He was born the 13th of May, 1909.    Then we must have made this trip to Windsor in January, 1909.    The way we came to make that trip, she told me she was in trouble, and I would have to do something for her.    She told me that a month before we went to Windsor.    She asked me to marry her at that time.

"*Q.* Did she ask you to marry her?

"*A.* Yes, sir; said I would have to marry her. * * *

"*Q.* What did you do?

"*A.* We went to Windsor to get married.

"*Q.* When did you go over there?

"*A.* The 2d day of January.    It was 8 or 9 o'clock in the evening when we went over there.    I got a license at that time.    She was on the outside waiting. I gave it to her.    I told her it was too late to have the ceremony performed that night; we would have to come back again.

"*Q.* Did she agree to it?

"*A.* Yes, sir."

Following the Windsor visit and the talk, whatever it was, and the parties are not agreed about what it was, the parties went to the home of the parents as husband and wife and lived there for a time.

The record abounds with testimony that the par-

ties lived together for several years, the defendant Severance representing the plaintiff as his wife. She was so regarded by his parents and by those with whom they associated. Mr. Severance took out insurance policies for her benefit, naming her therein as beneficiary and describing her as his wife. A child was born to them. Many letters and postal cards are in evidence, all of them of the character that pass between married people. At the time of the visit to Windsor the parties were young, single people; there was no legal impediment to their marriage. What was done and said, followed by their subsequent conduct, created a valid marriage. See *Hutchins* v. *Kimmell*, 31 Mich. 126 (18 Am. Rep. 164), and the many cases cited therein; *Peet* v. *Peet*, 52 Mich. 464 (18 N. W. 220); *Williams* v. *Kilburn*, 88 Mich. 279 (50 N. W. 293); *People* v. *Loomis*, 106 Mich. 250 (64 N. W. 18); *Flanagan* v. *Flanagan*, 122 Mich. 386 (81 N. W. 258); *Lorimer* v. *Lorimer*, 124 Mich. 631 (83 N. W. 609); *Bechtel* v. *Barton*, 147 Mich. 318 (110 N. W. 935).

The decree is affirmed, with costs to plaintiff against defendant Severance.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, BROOKE, and FELLOWS, JJ., concurred.