PEOPLE *v*. SPENCER.

1. APPEAL AND ERROR—FINDINGS OF FACT TREATED AS SPECIAL
   VERDICT.
   The findings of fact of a trial court sitting without a jury
   , are to be treated on appeal as a special verdict.

2. HUSBAND AND WIFE—COMMON-LAW MARRIAGE.
   A contract of marriage may be made and the relation of
   husband and wife established without proof of a formal
   ceremony conducted by a clergyman or magistrate, and
   without proof by actual witnesses to the making of the
   contract.

3. SAME.
   To establish a nonceremonial marriage, there must be
   proof, not only of the agreement, but of the setting up
   of the relation of husband and wife by cohabitation, and
   the parties must act in conformity with such agreement
   and live together and cohabit as husband and wife.

4. SAME.
   As applied to a common-law marriage, cohabitation means
   dwelling together, living in the usual manner of married
   people, a manifestation that the parties have consented
   between themselves to contract the marriage relation, a
   holding forth to the world by daily life, conduct, de-
   meanor, habit, that the man and woman who live together
   have agreed to marriage, and to stand to each other in
   the mutual relation of husband and wife.[1]

5. SAME.
   Evidence *held*, insufficient to establish a common-law mar-
   riage between decedent and one claiming his estate as
   his widow.

Error to Manistee; Withey, J. Submitted October
11, 1917. (Docket No. 162.) Decided December 27,·
1917.

Petition by William J. Graham, administrator of

[1] As to general characteristics and validity of common-law
marriage, see comprehensive note in L. R. A. 1915E, 8.

the estate of James S. Madison, deceased, to determine the heirs of said intestate. There was an order awarding the estate to Hattie Belle Spencer, as widow, and the people of the State of Michigan appealed to the circuit court. Judgment affirming the order of the probate court. The people bring error. Reversed.

*Alex. J. Groesbeck,* Attorney General, and *Clare Retan* and *L. W. Carr,* Assistants Attorney General, for appellant.

*Thomas Smurthwaite,* for appellee.

OSTRANDER, J. At Manistee, Mich., where he was a domiciled resident, James S. Madison died intestate February 26, 1915, possessed of real and personal property. Upon the petition of his foster mother, an administrator of his estate was appointed by the probate court of Manistee county. Administration proceeded until, in September, 1915, the administrator filed in said court his petition, setting up, among other things, that after paying, or retaining funds to pay, all claims presented, proven, and pending, and all expenses of administration, he had more than $1,000 for distribution to the distributees of said estate; that the distributee claimants were the foster mother of deceased, a woman named Hattie Belle Spencer, of Chicago, Ill., who claimed to be widow of the deceased, and the State of Michigan, which claimed that the said estate escheated, and praying that an order be made determining who were heirs of said deceased and who were entitled to inherit the real estate and to take the personal estate, and authorizing and directing a partial distribution thereof.

The State of Michigan thereupon filed a paper in said court objecting to the proceeding to determine heirs for the reasons (1) that the petitioning administrator had been appointed upon the petition of the

foster mother, who was neither the natural mother nor legal mother of deceased, upon whose petition the court was without authority to appoint said administrator; (2) the said administrator was not represented to be an heir at law of deceased and did not claim an interest in the lands belonging to the estate nor claim through or under any heir at law. It prayed that testimony theretofore taken be disregarded, and the hearing of the said petition and all proceedings taken in determining the heirs be quashed.

A hearing was had in December, 1915, and the court determined that Hattie Belle Spencer was widow and sole heir at law of the deceased, and ordered the partial distribution prayed for. The State claimed the benefit of an appeal, which was allowed, and in the circuit court, where the cause was heard by the court without a jury, it was held and determined that the order and determination of the probate court should be affirmed; and an order was entered accordingly. Findings of fact and law were made. They are:

"(1) That in the fall of the year of 1899, James S. Madison, now deceased, and Hattie Belle Spencer, the appellee in this cause, were residents of the city of Manistee in said county and State, and that they were, and each of them was at the time, competent to enter into the marriage relationship, there being no impediment to their marriage on either side.

"(2) That at the time stated they did mutually agree each with the other to enter into the marriage relationship, and did by said agreement make a valid contract of marriage.

"(3) That the said parties repeated their contract of marriage in substance and effect, to others, and lived and cohabited together as husband and wife, and held each other out to be husband and wife from that time till the death of the said James S. Madison, which occurred in February, 1915.

"I find, as a conclusion of law, that the agreement between the said parties, and their living and cohabiting together as husband and wife, and recognizing

that relationship, as aforesaid, was sufficient to constitute what is known as 'a common-law marriage'; that such marriage was valid, and that at the time of the death of the said James S. Madison, the said appellee was his lawful wife and is now his widow, and there being no other heir of the said James S. Madison, the said appellee, under the statute in such case made and provided, is the sole heiress of the estate of the said James S. Madison, deceased."

Certain amendments were proposed by the State, some of which seem to have been allowed and some disallowed. In effect, the findings are as above set out. The State of Michigan reviews the judgment. It appears that the foster mother does not further contest, and that in the circuit court the contest was one between the alleged widow and the State of Michigan.

It is said in appellant's brief that the single contention is that the findings are against the clear weight of the evidence. Argument for appellant is addressed solely to the proposition that by the clear weight of evidence the asserted common-law marriage of the deceased and Hattie Belle Spencer is not made out. The court having declared that the findings were made, without considering the testimony of the alleged widow and that she was not a competent witness, it is urged for the appellee, Hattie Belle Spencer, that her testimony was not incompetent, and must in any event be considered in respect of matters not equally within the knowledge of the intestate. A very considerable portion of the testimony for the claimant widow was taken by deposition, including her own testimony.

No one in this court is questioning the right to appeal from the order made by the probate court. See 3 Comp. Laws 1915, §§ 13915, 13916, 13930, 13937-13941. Compare Act No. 278, Pub. Acts 1887; *Lorimer* v. *Wayne Circuit Judge*, 116 Mich. 682 (75 N.

W. 133). And, an appeal having been taken and heard, no one denies the right of the State to review the judgment. As former statutes did, the present law makes the determination of heirship *prima facie* evidence of the facts found. The provision for appeals applies to "any order, decree, or denial, of a probate court." Whether the reasoning of the court in the case cited does not apply here with equal force is a question not presented by the argument made. Whether the fact that a partial distribution of the estate was prayed for and ordered distinguishes this case and *Lorimer* v. *Wayne Circuit Judge* is not suggested by counsel. With misgivings as to the finality of any judgment which can be rendered in this proceeding, I consider and decide the contention which is presented.

In considering the power and duty of this court to set aside the verdict of a jury, the trial court having refused to do so, it was said, in *Hintz* v. *Railroad Co.,* 132 Mich. 305, 307, 308 (93 N. W. 634, 635):

"The statute gives that power, and this court would disregard an obvious duty if it did not, in a proper case, exercise it. In exercising it, we are bound to recognize the principles which have always governed trial courts in determining whether or not verdicts should be set aside. We are also bound to bring to the support of the decision of the trial judge all reasonable presumptions which arise from his superior opportunity to determine the credibility of witnesses. When, however, in accordance with these principles, it is apparent from the record, notwithstanding every reasonable presumption in support of his decision, that the trial judge erred in refusing to set aside the verdict on the ground that it is against the weight of the testimony, the duty of this court to overrule that decision is manifest. *Whipple* v. *Railroad Co.,* 130 Mich. 460 (90 N. W. 287); *Baldwin* v. *Railway Co.,* 128 Mich. 417 (87 N. W. 380); *Cole* v. *Railway, ante,* 122 (92 N. W. 935)."

Again, in *Re McIntyre's Estate*, 160 Mich. 117, 120 (125 N. W. 51, 52), it was said:

"We held in the case of *Hintz* v. *Railroad Co.*, 132 Mich. 305 (93 N. W. 634), that it was the duty' of this court to review the evidence in a cause to determine whether a ruling upon a motion for new trial upon the ground that the verdict was contrary to the weight of evidence was erroneous. We cannot escape this responsibility, which was doubtless imposed by the legislature to provide relief against palpable miscarriages of justice through unjust verdicts, which all judges and lawyers know to be not uncommon. In the exercise of this power this court cannot content itself with a mere determination that there is a conflict of evidence, and that the jury is as well qualified to judge of the facts and the credibility of testimony as itself, which was the rule before, or that the trial judge has approved the verdict or even expressed his own belief that the verdict is not against the weight of evidence, and thereupon affirm the denial of a motion, but it must examine the testimony and determine for itself whether or not the verdict is so plainly against justice as to call for a new trial."

In the case at bar, there is no verdict of a jury, although the findings of fact are to be treated as special verdicts. The duty of the court is not, however, different from that defined in the opinions referred to.

The case upon the facts is singular. A woman, three times married and but lately released from imprisonment upon conviction for a crime involving sexual immorality, and a man, an acquaintance, owner and publisher of a daily and weekly newspaper, in November, 1899, entered into, and thereafter sustained, relations which continued until his death, the legal effect of which relations is in dispute. The woman was known as Hattie Belle Spencer; Spencer being her maiden name. She had at some time prior to 1899 been employed at newspaper work by the deceased. Her reputation in Manistee was that of a sexually immoral woman. The man was reputed,

whether generally is not made clear, but among some at least, to be part negro. Whatever the relation was, and it was admittedly an intimate one, the constancy of each to the other is not denied. The testimony for the woman (appellee) tends to prove that upon her return to Manistee soon after her release from prison, she and the man agreed presently to take each other for husband and wife; that they declared and published to others the fact that they were husband and wife, and maintained with each other, upon occasions, some of the relations of married people.

Marriage is a fact. In this State, the contract of marriage may be made and the relation of husband and wife established without proof of a formal ceremony conducted by a clergyman or magistrate, and without proof by actual witnesses to the making of the contract. It was said by Chief Justice CAMPBELL, in *Proctor* v. *Bigelow*, 38 Mich. 282, 283:

"The marriage was proved by her son's testimony, showing that she and his father lived together and brought up a large family, treated each other on all occasions as husband and wife, were so reputed in the family and by others, addressed each other as such, and jointly signed papers in that relation.

"We know of no authority which requires any better proof of marriage, unless in criminal prosecutions and cases of seduction. There is no rule of law making marriage records the best evidence in any case, and even where they exist some parol evidence is usually necessary to identify the parties, in case of any controversy. In most cases where the right to property is to be made out by proof of a marriage, the witnesses who were present are not living or attainable. One or both of the married persons must die before any inheritance or dower can exist. It would be impossible in a majority of such cases to prove a marriage by any better testimony than conduct and reputation. The general presumption in favor of legality has led to more liberal rules instead of stricter ones in modern times, as more just and reasonable.

1 Starkie, Ev. p. 45; *Hutchins* v. *Kimmell*, 31 Mich. 126 [18 Am. Rep. 164]; 2 Greenleaf's Ev. § 462; 3 Edwards' Edition of Phillip's Ev. p. 599, and cases."

See, also, *Hoffman* v. *Simpson*, 110 Mich. 133 (67 N. W. 1107); *Clancy* v. *Clancy*, 66 Mich. 202 (33 N. W. 889); *Cross* v. *Cross*, 55 Mich. 280 (21 N. W. 309); *Severance* v. *Severance*, 197 Mich. 327 (163 N. W. 924).

It is probably no longer true that as to ceremonial marriages at least it is impossible to prove them—a majority of them—except by testimony of conduct and reputation. But, the issue being marriage or no marriage, the fact must be proven either by the record or by witnesses to the celebration of the marriage or by facts from which marriage may be presumed. In this State a marriage is not proven by evidence only that the parties, *inter se*, agreed to take each other for husband and wife. To establish a nonceremonial marriage, there must be proof, not only of the agreement, but of the setting up of the relation of husband and wife by cohabitation. The parties must act in conformity with such an agreement and live together and cohabit as husband and wife—live together in that relation. *Hutchins* v. *Kimmell*, 31 Mich. 130 (18 Am. Rep. 164); *People* v. *McQuaid*, 85 Mich. 127 (48 N. W. 161); *Peet* v. *Peet*, 52 Mich. 467 (18 N. W. 220); *Lorimer* v. *Lorimer*, 124 Mich. 631 (83 N. W. 609); *Judson* v. *Judson*, 147 Mich. 518 (111 N. W. 78).

The common-law marriage, so-called (or miscalled), is recognized in the interest of the family and of legitimacy of offspring. If the family relation is established and maintained in consequence of, and pursuant to, the mutual agreement to marry, the law recognizes the union; the family. Cohabitation in this behalf means dwelling together; living in the usual manner of married people. It is a manifestation that the parties have consented between themselves to con-

tract the marriage relation, a holding forth to the world by daily life, conduct, demeanor, habit, that the man and woman who live together have agreed to marriage and to stand to each other in the mutual relation of husband and wife. *In re Yardley's Estate,* 75 Pa. 207; *Robinson* v. *Robinson,* 188 Ill. 371 (58 N. E. 906) ; *Campbell* v. *Campbell,* L. R. 1 H. L. Sc: 182.

If we exclude the testimony of appellee, there is no proof of the making of mutual promises to marry. But waiving the competency of the witness in this behalf and accepting her statement as true, let us see what evidence of marriage the record affords. There is evidence of some introductions of each by the other, to others, as, "Meet my husband," or "This is my wife," but none that the introducing party mentioned the name of the one introduced. It is to be inferred, and from all of the testimony I do infer, that these introductions, as testified to, were made, not to state a fact, but to furnish an excuse for, to avoid comment upon, visible, open relations which could be satisfactorily explained in no other way. There is evidence of considerable financial provision made by the deceased for the appellee. In this connection, however, it appears that when a parcel of real estate was purchased in Chicago, it is said with money furnished by the deceased, the title was taken in the name of appellee and her daughter. After the alleged marriage, too, appellee disposed of real estate in Manistee by a conveyance in which she is described as "widow." Appellee did not change her name. There is testimony tending to prove that the deceased declared that he would some day assume the name of Spencer. While little is disclosed of the antecedents, birth, and social standing of the deceased, it may be inferred that he did not for years conduct the business of publishing a newspaper in Manistee without becoming a well-known man, a figure in the business

community, if not in the social life, of that place. It is said they agreed, in November, 1899, to take each other for husband and wife, and celebrated the agreement that night by occupying the same bed at appellee's home. It may be inferred that they had before that time occupied the same bed. The deceased had before that time habitually slept in his office and taken his meals at various places about town. The appellee had maintained a house, a place in which she and her daughter lived, in the same city. So far as appearances went, neither changed the mode of living. Mr. Madison did not thereafter openly live and cohabit with appellee. He set up no home, no dwelling, no household. He perhaps spent more hours with her, remained at her house more often for the night, or a part of the night. If appellee's family, or some of them, and one or two of her friends in Manistee are excluded, no one there knew about or observed any change in the manner in which Mr. Madison lived. No friend of his, or particular acquaintance, is shown to have had any knowledge of a matrimonial relation, or of facts from which the existence of the relation could be inferred. Not a business acquaintance of his or a social friend is produced to prove knowledge of his cohabitation with appellee. On the contrary, he still maintained a place in his office to sleep, and still took his meals about town. From November, 1899, until some time in 1905, when appellee moved to Chicago, this state of affairs existed. In Chicago appellee set up a rooming house. In 1907 the deceased purchased a dwelling in Chicago, the title thereto being taken in the name of appellee and her daughter. From 1905 until shortly before he died, deceased visited appellee in Chicago, usually upon holidays, remaining a day or two, sometimes longer. At such times the parties occupied the same room and bed. It was during some of these visits that the in-

troductions above referred to were made. After 1899 he kept at appellee's house some of his personal belongings, as some shirts, collars, and nightshirts. After Mr. Madison died, appellee filed in probate court a claim for services she had rendered him from January, 1892, to December, 1897, and from November, 1898, to August, 1905.

It is true, as contended for the appellee, that outside of her immediate family and a few acquaintances appellee's social connections were limited, and it is pointed out that it does not appear that Mr. Madison had an extended social alliance. It is argued that it is made to appear that in appellee's family—to some extent at least—and among neighbors of hers in Chicago, it was understood, or was supposed, that she and Mr. Madison were married. But except that, while in Chicago, Mr. Madison behaved with appellee as a husband habitually behaves with his wife, there is little evidence to sustain the idea that he was holding himself out as husband.

There are in the record a great many letters written by Madison to appellee, one at least written in 1907, some in each year thereafter, to and including the year 1914. It is not claimed that this is all of the written correspondence of the parties. Very uniformly, the letters are addressed "Dear Belle," and are signed "Jim," "J. S. Madison," or "J. S. M.," some of them being unsigned. In none of the letters does he refer to her as his wife, nor mention the relation of husband and wife as existing.

My attention is directed to testimony tending to prove that it was the intention of Mr. Madison to sell his interests in Manistee upon a favorable opportunity presenting itself, and thereafter to live in Chicago with appellee. It is said that only unfavorable conditions prevented the setting up of a home in Chicago. There are expressions in some of the letters I have

referred to indicative of his purpose to provide for the old age comfort of appellee and himself, but unless the thought of marriage was otherwise introduced, no one would assume from the relations they maintained, or from the letters produced, that they were married. The usual daily life of Mr. Madison negatived matrimonial relations. The family physician of appellee in Chicago never was told and did not know or assume that appellee had a husband. I do not express an opinion concerning the competency of the testimony of appellee. I am impressed, viewing all of the testimony, that it fails to establish the fact that these parties were husband and wife—were married—and therefore fails to sustain the judgment.

It follows that the verdict and judgment must be set aside, with costs of this appeal to the appellant.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.