The bill in this cause is filed by Gertrude E. Maxwell against her husband, William T. Maxwell, for maintenance under section 26 of the Divorce act. The defendant answered, *Page 494 
admitting going through a form of ceremony of marriage with the complainant, and, by a cross-petition, charges that the complainant entered into a common law marriage with one Charles McClellan, and lived with him as his wife for many years, and that there is one child born of the union; that Charles McClellan was living at the time of the supposed marriage to the defendant, and is still living, and that the said marriage has not been dissolved or annulled, but was then subsisting, and that at the time of the marriage to defendant she held herself out to be the widow of Charles McClellan, and that the said child was the issue of such marriage.
The answer of the complainant to this cross-petition denies the common law marriage, as well as the facts alleged in the cross-petition, which tended to show the same, and says that at the time of the marriage said defendant had full knowledge of the fact that, although she had a child born to her, she was unmarried.
The parties in this suit were married at Ridgefield, Bergen county, New Jersey, on November 28th, 1923. In the certificate and record of marriage the complainant's maiden name was given as Gertrude Nadratoska. The defendant gave his age as thirty-five years, and the complainant gave hers at twenty-five years. In one column are the words "Single, Widowed or Divorced," and in this column the words "Single" and "Divorced" are erased as to the defendant, and the words "Widowed" and "Divorced" erased as to the complainant; thus the representation contained in the certificate is that the defendant was a widower and the complainant single. Under the column "No. of Marriage" the certificate shows that this was the second marriage of the defendant and the first marriage of the complainant. The answer of the defendant says that the defendant had four children by his previous marriage, one of whom was married and three were under the age of twenty-one years, and that the complainant had one child, a boy of six years of age.
It seems that some dissension arose between the parties concerning the treatment of the defendant's children by the *Page 495 
complainant, which resulted in their separation on January 8th, 1924, less than two months after the marriage, the defendant taking his children with him. Afterwards, learning, as he says, of the common law marriage between the complainant and McClellan, he says he took his "stuff" away January 18th, 1924, and did not return to her. After the separation and before the trial a child was born to the complainant and defendant.
When the case was opened it was considered wise to try the annulment case first, as the result of such trial might dispose of the case for separate maintenance, at least as to the complainant, and the case was thereupon proceeded with on the defendant's cross-petition for annulment.
The facts are as follows: On August 8th, 1918, a child, Charles Wilfred McClellan, was born to the complainant and Charles W. McClellan. The attending physician was Dr. Charles H. Fink. The mother's age in the certificate of birth was given as twenty years, and the father's thirty-three. The complainant was delivered at the home of her mother, 437 Pacific avenue, Jersey City. There was present at the time the father, Charles McClellan. This is testified to by McClellan, but is denied by the complainant. The residence of McClellan was at 267 Washington street, Jersey City, at which place his family owned a saloon, and he acted as bartender there, and the family, including McClellan, lived in the floors above the saloon. Thus, McClellan and the complainant lived about a mile and a half apart. At the time of the birth of this child McClellan was a married man, having been married to Mabel Withers at Lancaster, Pennsylvania, on November 5th, 1913, who divorced him on August 12th, 1918, in the court of common pleas of Dauphin county, Pennsylvania, four days after the birth of the child, Charles Wilfred McClellan. Prior to the birth of this child the complainant held herself out as being married to McClellan. After the child was born she visited McClellan at the saloon in Washington street four or five times a week, taking the baby with her, and seemed to be on friendly relations with McClellan, his mother and the members of his family. *Page 496 
The testimony of McClellan was taken in Harrisburg, Pennsylvania, prior to the hearing, and he testified that she, at the time the child was born, asked him to marry her, and he told her he would later on. He did not tell her, however, that he was then the husband of another woman, and his story throughout is to the effect that he promised her, from time to time, to marry her by a ceremonious marriage, or otherwise.
The evidence is overwhelming that, during the time from the birth of the child down to the time McClellan left the city and went to Pennsylvania, in June, 1920, she held herself out to the community in the neighborhood of 267 Washington street and 437 Pacific avenue, Jersey City, as the wife of McClellan, and was known by the neighbors as being such.
After the child was born the complainant made a complaint to the overseer of the poor in Jersey City that her husband, Charles McClellan, was not supporting her and her child, and the poor master fixed an appointment and wrote to McClellan to meet him with his wife. The parties appeared before him, and the poor master directed him to pay $10 a week. The poor master had several assistants who sometimes interviewed the applicants, and both the poor master and his assistants made entries in a book, which was their record of what transpired at the meetings, and, while the poor master knew, in a general way, the history of this case, and saw the parties frequently, it would appear that he did not, in every instance, attend to these parties when they came to his office. On being examined as to the dates when his record shows that he handled their case, he found that his name appeared only as to the examinations on June 5th, June 8th and June 28th, 1920. He says that McClellan and Mrs. Maxwell appeared on June 8th, 1920, and that, on that occasion, "the two of them called at my office in Bright street, and they told me they were going to look for rooms and get away from both parties [that is, the relations]; that they thought they could get along better together if they got away from both sides." I have ignored the testimony of the poor *Page 497 
master as to what transpired on other occasions than June 5th, June 8th and June 28th, because he, apparently, made no record of it. On June 30th, 1920, the complainant called at the office of the poor master and saw Mr. Gately, a clerk of the poor master, and she said to him that "her husband was at Harrisburg, and that she had a warrant issued June 29th, 1920, from Judge Sullivan's court; she said he ran away on Monday to Harrisburg." On June 29th, 1920, she went with John Eggers, a detective, to the prosecutor's office with the warrant for McClellan, to have him extradited. She was turned over to one of the prosecutors. Nothing further was done.
On September 16th, 1919, shortly after the birth of the child, complainant "of No. 437 Pacific avenue, Jersey City, New Jersey," made a complaint in the juvenile court against "Charles McClellan, of 267 Washington street, Jersey City," in which she swore that she was the wife of Charles McClellan, and that "he absconds, deserts and willfully refuses and neglects to provide for and maintain his wife and family, and by reason thereof they are liable to become chargeable on the city of Jersey City." Afterwards, on September 22d 1919, she wrote to Judge Grece, who was judge of the juvenile court, stating the she and her husband had agreed to live together again, and were going to get their own apartments, and that she was hasty in taking the means she did, and, therefore, trusted that there would be no further need of continuing the trouble, and says, "If I must be in your court Wednesday, and my husband, 'phone my husband, 620 Montgomery." This communication is signed by the complainant.
A barber testified that McClellan took the complainant to his establishment to have "his wife's hair shampooed." Another witness testifies that he was with McClellan on the street, and McClellan told him he was "waiting for his wife," and the complainant came up to them, and then, without anything being said, the witness went on his way.
There was one witness, Annett, who testified that he lived over the saloon at 267 Washington street for two weeks, and during that period he saw the complainant and McClellan *Page 498 
entering one of the bedrooms late at night with the baby. This man's testimony I do not regard as of much value. I think the overwhelming evidence is that she slept in her mother's house on Pacific avenue continuously after the birth of the child. On this point, however, neither party has produced all of the evidence that the nature of the case is susceptible of. McClellan's mother, his brother and two sisters are living, none of whom were called.
On September 30th, 1920, the complainant signed an application to the Metropolitan Life Insurance Company, in which, in answer to the question, "If adult, married or single?" there was written "separated," and the words "married or single" stricken out.
On April 5th, 1920, she took out a policy in the Metropolitan Life Insurance Company on the life of Charles McClellan, her child, and, on the same day, took out two more policies in the name of Gertrude McClellan, in the same company. She says that these policies were taken out by her mother, but her mother, although called and examined, was not questioned on the subject.
She told the members of her family, and they believed, that she was married to McClellan for about two years, until McClellan left Jersey City; then she says she told the truth to her mother and family.
She admits that she perjured herself on the application to the juvenile court, and lied to people about her marriage. And all of these things she said she did to keep herself and child and family from disgrace.
The defendant says that before he married her she told him that she was a widow, and the widow of McClellan. She told the defendant's sister, while they lived on Olean avenue, that her husband (McClellan) took sick and went up to Canada and came home and died. She also told the father of defendant that her former husband, McClellan, was dead.
On returning from the marriage ceremony the defendant asked the complainant why she had given her status to the priest as single instead of a widow, and she replied that "it didn't make any difference, that she was single." *Page 499 
In view of her perjury and lying, as she says to defend her fair name and that of her family, I place little credence in any story she has told which favors her case, and, therefore, take it as true that she did represent to the defendant that she was a widow at the time of the marriage, and made the representations to the father and sister of the defendant that she was a widow, as testified to by them.
Defendant produced as a witness complainant's brother, a worthless boy, who had been convicted of crime, and who, to wreak vengeance upon his sister, mother and family, went on the stand and testified that the complainant lived with McClellan at his mother's house on Pacific avenue. This is all denied by the mother and the family, and I am satisfied that his story is made out of the whole cloth.
Notwithstanding the great wrong which the complainant says McClellan had done her, she seems to be on rather friendly relations with him and his family. Shortly after the first hearing he called her on the 'phone and attempted to borrow from her $40. This she admits, saying that about a week and a half after the first trial McClellan called her up on the 'phone and asked her to loan him $40, and she told him she did not have it. She says, "He said he wanted it for some business, and his mother had a paralytic stroke and he needed money, and being that his mother was very good to me when the baby came, he thought maybe I would help him out by loaning him $40, and I didn't have it, and I didn't give it to him." This testimony was brought out in rebuttal of her brother Anthony's testimony, who said that McClellan had telephoned that if she did not send him $40 he would tell the court that his testimony was a lie, all of which she denied.
The complainant also told the members of the family that she had been married to McClellan in St. Thomas' Church, in New York City, which she says was also a lie; and there is no evidence in the case, nor any suggestion, of a ceremonious marriage between McClellan and the complainant.
This reduces the case to one proposition, namely, were the complainant and McClellan husband and wife under a common *Page 500 
law marriage contracted prior to the marriage to Maxwell?
At the time that this McClellan child was born, the parents being incapable of contracting, there could have been no common law marriage, and there is no evidence that at any time thereafter was there any agreement of marriage per verba depraesenti. If this suit was between McClellan and the complainant, one side seeking to establish the marriage and the other side opposing, it is likely, if true, that evidence could have been offered showing the time when such contract was entered into. But here, both McClellan and the complainant are interested on the same side in denying the existence of such marriage; therefore, the defendant is unable to prove such agreement, even if it existed. In this situation the defendant, to prevail, must show that McClellan and the complainant lived together in such habit and repute that a presumption is raised of a contract of marriage per verba de praesenti.
In Commonwealth v. Stump, 53 Pa. St. 132 (at p. 136), Chief-Justice Woodward said: "Reputation and cohabitation, at best, are only presumptive proofs, and, where either of these grounds fails, the court should not allow the presumption of marriage to be built upon the other."
In order to establish a presumption of a common law marriage by habit and repute, there must, not only be shown cohabitation, but reputation as husband and wife. Neither reputation without cohabitation, nor cohabitation without reputation, raises this presumption.
In re Yardley's Estate, 75 Pa. St. 211, Chief-Justice Agnew said: "Neither cohabitation, nor reputation of marriage, nor both, is marriage. When conjoined, they are evidence from which a presumption of marriage arises." He says, further: "The Scotch expression conveys the true idea, perhaps, better than our own, `the habit and repute' of marriage. Thus, when we see a man and woman constantly living together, where one is dwelling there the other constantly dwells with him, we obtain the first idea or first step in the presumption of marriage, and when we add to this that the *Page 501 
parties are constantly living together, are reputed to be man and wife, and so taken and received by all who know them both, we take the second thought or second step in the presumption of the fact of marriage. Marriage is the cause — these follow as the effect."
In re Boyington's Estate, 157 Iowa 467; 137 N.W. Rep. 949 (atp. 951), the court said: "As already indicated, reputation is important only as bearing on the intention of the parties in living together."
To the like effect are In re Callery's Estate, 226 Pa. 469;75 Atl. Rep. 672; Taylor v. Taylor, 10 Colo. App. 303;50 Pac. Rep. 1049; O'Malley v. O'Malley, 46 Mont. 549; 129 Pac. Rep. 501;People v. Spencer, 199 Mich. 395; 165 N.W. Rep. 921;. Williamsv. Herrick, 21 R.I. 401; 43 Atl. Rep. 1036.
In Wallace's Case, 49 N.J. Eq. 530 (at p. 535), Chancellor McGill cites with approval the views in Yardley's Case, supra, which he says will serve to illustrate that which is meant by matrimonial cohabitation, namely: "But it is a misnomer to call the visits of Howard Yardley to Elizabeth Sithens cohabitation. It was lacking in its chief element — constancy of dwelling together. * * * His visits to her were of an irregular kind, and, however frequent and continued, bore no resemblance to married life." The chancellor, continuing, says: "He further says that `matrimonial cohabitation is where the parties have the same habitation, so that where one lives and dwells there does the other live and dwell always with him.'" There is not the slightest evidence of cohabitation in this case.
The burden of proof being cast upon the defendant to establish a contract of marriage per verba de praesenti, and having attempted to establish a presumption of such marriage by proving habit and repute, and having failed to prove cohabitation, his cross-petition will be dismissed. Vreeland v. Vreeland
(Chief-Justice Gummere), 78 N.J. Eq. 256; Michaels v.Michaels (Vice-Chancellor Foster), 91 N.J. Eq. 408.
 Counsel may apply for a day to try the maintenance suit. *Page 502