CRIPPEN *v.* CHATTERTON.

1. APPEAL AND ERROR—DUTY OF SUPREME COURT TO REVERSE CASE
   WHERE VERDICT AGAINST OVERWHELMING WEIGHT OF EVIDENCE.
   Under 3 Comp. Laws 1915, § 12635, it is the duty of the
   Supreme Court to reverse a case where clearly convinced
   that the verdict is against the overwhelming weight of
   the evidence, although the evidence was sufficient to take
   the case to the jury.[1]

2. CONSPIRACY—CORPORATIONS—ULTRA VIRES—CONTRACTS.
   In an action by an inventor against a corporation and
   some of its officers and stockholders charging that de-
   fendants conspired to defraud him of his patent by organ-
   izing a new corporation to manufacture same, and then
   wrecking it, where defendant corporation bought stock
   in its corporate name and paid therefor, plaintiff could
   not complain of the *ultra vires* feature thereof, since the
   contract was carried out and he had the benefit thereof.[2]

3. SAME—EVIDENCE—ADMISSIBILITY.
   The receiving of testimony that defendant corporation was
   acting *ultra vires* in buying stock in the new corporation
   in its own name, and the use to which said testimony
   was put, *held*, reversible error, in view of the fact that
   plaintiff could not possibly have been harmed by the *ultra
   vires* feature of said contract.[3]

4. SAME—OVERWHELMING WEIGHT OF EVIDENCE.
   Plaintiff's claim that said new corporation was organized
   and later wrecked as a conspiracy to defraud him of his
   patent, *held*, not sustained by the evidence, and a verdict
   in his favor is therefore reversed as against the over-
   whelming weight of the evidence.[4]

Error to Isabella; Hart (Ray), J.    Submitted June
11, 1924.    (Docket No. 61.)    Decided October 6,
1924.

---

[1]Appeal and Error, 4 C. J. § 2835; [2]Corporations, 14A C. J. §
2172; [3]Id., 14A C. J. § 2981; [4]Conspiracy, 12 C. J. § 231.

Case by George F. Crippen against H. E. Chatterton and others for a conspiracy to defraud.    Judgment for plaintiff.    Defendants bring error.    Reversed.

*Reynolds, Sessions & Pierce* and *F. H. Dusenbury,* for appellants.

*O. L. Smith, H. Victor Spike,* and *F. C. Wallington,* for appellee.

FELLOWS, J.    Section 63 of chapter 18 of the judicature act (3 Comp. Laws 1915, § 12635), re-enacting section 1 of Act No. 134, Pub. Acts 1893, reads:

"In all cases hereafter taken to the Supreme Court on writ of error or appeal, where a motion for a new trial has been previously refused by the trial judge, the party appealing the same may incorporate in the bill of exceptions a record of all proceedings had on said motion for a new trial, including the reasons given by the trial judge in refusing to grant said new trial. Exceptions may be taken and error assigned on the decision of the circuit judge in refusing such motion, and the same shall be reviewed by the Supreme Court."

In the case of *In re McIntyre's Estate,* 160 Mich. 117, Justice HOOKER, speaking of the duty of the court under the original act, said:

"We cannot escape this responsibility which was doubtless imposed by the legislature to provide relief against palpable miscarriages of justice through unjust verdicts, which all judges and lawyers know to be not uncommon.    In the exercise of this power this court cannot content itself with a mere determination that there is a conflict of evidence, and that the jury is as well qualified to judge of the facts and the credibility of testimony as itself, which was the rule before, or that the trial judge has approved the verdict or even expressed his own belief that the verdict is not against the weight of evidence, and thereupon affirm the denial

of a motion, but it must examine the testimony and determine for itself whether or not the verdict is so plainly against justice as to call for a new trial. That this statute may be disapproved by those who entertain the idea that the verdicts of juries are necessarily and invariably honest, candid, discriminating, and just does not affect the question. Evidently the legislature has recognized the common belief that jurors have their foibles and juries their faults which interfere with the ideal administration of justice, and has attempted to apply a remedy by enlarging the rule heretofore adopted and followed by the appellate courts. It had the power to confer such authority upon the appellate courts."

Since the enactment of this provision this court has carefully avoided usurping the functions of the jury and setting aside verdicts solely because they do not comport with our views of what they ought to be, and we have reversed cases under this statute, only in those cases where the verdict is so manifestly against the overwhelming weight of the evidence as that the decision of the trial judge denying the motion for a new trial amounts to an abuse of discretion. But where the verdict is clearly against the overwhelming weight of the evidence our duty is clear, and we have never shirked it even though it was exacting and disagreeable. By taking the proper steps defendants in the instant case have saved this question for review. While we think there was testimony in the case taking it to the jury a careful reading of this record of 541 pages clearly convinces us that the overwhelming weight of the testimony is with the defendants and to allow this verdict of $32,759.03 to stand would be to perpetrate a rank miscarriage of justice which under this statute it is our duty to prevent.

In 1904, plaintiff invented a bean picking machine. He had litigation over the title to the patents with his attorney and a half interest in the patent was decreed

to the attorney.    The patent seems to have remained dormant until about 1916 when a man named Judson purchased the interest held by the attorney and commenced the manufacture and sale of the machines. Plaintiff designed and had patented another bean picking machine which while containing some of the principles of the old machine did not infringe that patent.    In 1918 and for some time before plaintiff was manufacturing these machines in a small way at Ypsilanti.    The machine separated the good beans from the culls and took the place of considerable hand labor.    Defendant Chatterton & Son is a corporation dealing in farm products including beans and owns and operates several elevators at different places.    The individual defendants are either directors of or connected otherwise with the company, H. E. Chatterton being the largest stockholder and the most active in its management.    He became interested in plaintiff's machines, bought one and ordered two more for use in elevators of the company.    In February, 1918, after writing plaintiff he called on him at Ypsilanti and negotiations were opened with a view of acquiring by Chatterton & Son of an interest in plaintiff's patents and the manufacture of the machines on a larger scale. Plaintiff testified on the trial that his patents were worth $35,000 and it is quite clear from his testimony that he would have sold them for that figure in cash at the time these negotiations were entered into.    On the 4th of March plaintiff and the company entered into a contract by which it was agreed that a corporation should be organized in which plaintiff was to have $20,000 worth of stock for his patents and some machinery and other tangible property worth $2,500 and the company was to put in cash in the sum of $20,000 for which that amount of stock was to be issued.    On the same day although the corporation was not then organized plaintiff as president of the

Crippen Manufacturing Company entered into an agreement with Chatterton & Son giving it the exclusive sales agency of the machines so long as it disposed of the entire output. About 60 days thereafter plaintiff moved what machinery he had to Mt. Pleasant where the board of trade had donated a site for the plant through the efforts of Mr. Chatterton; the Crippen Manufacturing Company was organized, new machinery was bought and the manufacturing of the Crippen pickers began. Plaintiff assigned his patents to the company and Chatterton & Son not only put in the $20,000 it had agreed to, but as established by the canceled checks beyond question approximately $50,000 additional. For some time the output of the plant was disposed of; plaintiff himself testifies:

"From the starting of production up until the fall of 1919 there was never enough unsold machines on the floor to do any particular harm. There might have been a couple and there might have been one, and there might possibly have been three, but not enough to create any trouble. * * * I found no fault with the rate they were going out until possibly the first of March, 1920. The product was, I thought, selling itself."

Later the output of the plant was not sold and we shall presently consider more in detail this subject. Ultimately a receiver for the company was appointed, which receivership proceedings were pending when this case was tried.

This suit was brought charging the defendants with having in the inception of the transaction conspired to deprive plaintiff of his valuable patent and with having accomplished that result by organizing and then wrecking the company, after some three years' effort.

At the outset we are confronted with the proposition that if plaintiff's claim is true defendant company has invested substantially $70,000 in the furtherance of a conspiracy to deprive plaintiff of a patent worth

$35,000, which could probably have been purchased at that figure if a cash offer had been made. This proposition is so startling as to challenge most careful consideration and analysis of all the testimony and the surrounding circumstances. The defendant corporation was an extensive dealer in farm products, interested in 28 elevators; the individual defendants were successful business men. Business men do not usually hazard $70,000 in a fraudulent attempt to secure something they can honestly acquire for half that sum.

While the plaintiff claims that threats were made by defendant Chatterton early in the history of the company, which he insists characterizes defendants' attitude (the making of such threats being denied by Mr. Chatterton), he relies on certain outstanding circumstances as evidence of a conspiracy entered into by defendants, or at least some of them, at or before the beginning of their dealings with plaintiff, which conspiracy had as its object and purpose the defrauding him of his patents. The first of these circumstances grows out of the fact that the agreement with plaintiff to organize the company and put up $20,000 cash for that amount of stock was signed by the corporation, Chatterton & Son. Plaintiff's counsel urge that the corporation could not hold stock in another corporation, that the contract was, therefore, *ultra vires*, unlawful and unenforceable, and it was much pressed upon the trial before the jury that at the very inception the defendant corporation entered into an "unlawful" contract. Doubtless this had much influence with a jury unfamiliar with corporate affairs. By the terms of the agreement Chatterton & Son, corporation, agreed to put in $20,000 cash. It is not disputed that the corporation did put in this amount. Whether the contract was *ultra vires* or not it was carried out. It was an executed contract.

Had plaintiff been a stockholder of Chatterton &
Son, or had Chatterton & Son refused to carry out its
terms because *ultra vires,* plaintiff might have cause
for complaint.    But it is difficult to perceive how,
after he had had the benefits of the agreement and it
had been fully performed he could in any way claim
to have been harmed by its *ultra vires* feature.   The
receiving of this testimony and the use to which it
was put constituted reversible error.

Closely connected with this claim is the further
claim that when the Crippen Manufacturing Company
was organized and one-half the stock issued to plain-
tiff, the other half was split up between directors of
Chatterton & Son, and the election of a board of
directors for the Crippen Company made up of a
majority of Chatterton & Son's directors resulting in
the Chatterton interest controlling the board of the
Crippen Company.    It is admitted by both parties
that the attorney who drew the papers, a reputable
practitioner, advised them that Chatterton & Son could
not hold stock in the Crippen Manufacturing Com-
pany, another corporation; plaintiff, however, claims
he was not so advised until a later date.    Plaintiff,
holder of one-half of the stock, however, voted his
stock for the election of these men each year and as
president of the company signed their stock cer-
tificates and the record is convincing that they acted
in harmony until the financial slump to which we shall
presently refer.    We say the record is convincing:
our attention is not called to the minutes of any meet-
ing of the board of directors of the Crippen Manu-
facturing Company during this period, and we have
found none, where all the directors did not vote the
same way on every proposition before the board.
Letters written by plaintiff during this period in-
dicate a unity of action with no complaints from him.
The Chatterton interests made up a majority of the

board of the Crippen Company but we are overwhelmingly convinced that they acted honestly and for the best interests of the company.

The making of the so-called exclusive sales contract with Chatterton & Son is also noted as one of the earmarks of a conspiracy to defraud. As we have pointed out, this contract, which was signed by plaintiff on behalf of the Crippen Company, gave Chatterton & Son the exclusive sales agency only so long as it was able to sell the entire output; when Chatterton & Son failed to sell all the machines manufactured, it could be terminated. The contract upon this record was a prudent one for the Crippen Company; Chatterton & Son was in daily touch with the bean dealers, two men were constantly on the road calling on them; at no expense to the Crippen Company unless sales were made these men interested the dealers in the Crippen picker. If sales were made it was agreed that a small commission was to be paid to Chatterton & Son. The files in the receivership proceedings show that Chatterton & Son were credited with only a portion of the earned commissions. We see nothing unfair in the contract or the use that was made of it.

Crucial in plaintiff's case is his claim that the Chatterton interest suppressed sales of the machines. We have already noted his testimony to the effect that the output was sold during the first two years. He testifies that he saw a telegram from the California representative ordering 12 machines and testifies that the order was not filled. He does not produce the telegram either from the files in the office of the company or from the telegraph office. Defendants deny that any such order was received and the testimony of the California representative taken by deposition is that he sold but one machine and fully details his efforts to make sales and the reason why California did not furnish a market for the machines. The

machines after an improvement made by plaintiff had been put on were selling for $1,350 each. The Crippen Company then owed the Chatterton Company many thousands of dollars. A sale of 12 machines would have brought to the Crippen Company around $15,000 which, if applied on this debt, would have meant that that sum would go to Chatterton & Son. It is almost inconceivable that the Chatterton interest was so shortsighted, so bent on ruining plaintiff and the Crippen Company that it passed up this opportunity to materially reduce its loan and suppressed this sale. The undisputed testimony establishes that in the spring of 1920 the price of beans had fallen from $8 a bushel to $3 a bushel and that many bean dealers were caught in the slump; they were in no position to invest in new machinery. Other picking machines were in the market and the competition was keen.

Numerous exhibits were introduced during the trial, a number of them being the advertising matter sent out to the trade and appearing in the trade journal during 1920. Plaintiff prepared the matter for the catalogue and does not claim that it was not printed or that any printed matter requested by him was not furnished. The exhibits which have been examined show an intensive advertising campaign for the machines. By action of the board of directors plaintiff was asked to go out himself to sell the machines. He did so but was not successful. A man was hired but proved incompetent and made no sales. Another man was hired to look after the affairs of the company at the plant so that plaintiff could devote his time to the sales end of the business but after his unsuccessful efforts he declined to go out again. Plaintiff claims that the failure to make sales was due to suppression of sales by the Chatterton interest in furtherance of the conspiracy to form and then wreck the company. Defendants insist that the

failure to make sales was due to the financial slump and the keen competition of other companies. The undisputed facts are overwhelmingly with the defendants on this branch of the case.

Plaintiff insists that he was not given access to the books and that he was finally locked out of the plant. Defendants testify that he was not denied access to the books; plaintiff testifies that he was, although on cross-examination he admits that his attorneys were permitted to examine them. When the time came that the machines on hand could not be sold it was decided to quit manufacturing and close the plant. Defendants claim that some things had been taken from the plant and there were a number of keys out which fitted the lock and for this reason a new lock was put on, and that three keys were provided, one of which was intended for plaintiff and which he could have had for the asking. We do not attach much significance to this incident.

We have noted that the receivership proceedings had not terminated when this case was tried but so far as they do appear in the record they disclose that the company was in financial straits and that the only thing for the Chatterton interest to do was to liquidate it and pocket the loss. If the condition of the company was not as the receivership proceedings indicate they were, plaintiff could have shown that fact in the receivership proceedings of which he had notice.

We have read and re-read this voluminous record with care and are convinced almost to a moral certainty that defendants did not conspire to organize and then wreck the company in order to defraud the plaintiff of his patents. The company entered a period of financial depression top-heavy with debt; it was unable to sell its product; it was unable to redeem its obligations; its competition was aggressive; it met the same fate that thousands of honestly managed

companies have met in the past, and that thousands of honestly managed companies will meet in the future. To allow this verdict and judgment to stand would be a gross miscarriage of justice.

The judgment will be reversed and a new trial granted. Defendants will recover costs of this court.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, STEERE, and WIEST, JJ., concurred.