## GIBBONS v. DELTA CONTRACTING CO.

1. AUTOMOBILES—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

In action for injuries arising from collision between plaintiff's westbound car and defendant's eastbound truck shortly after noon on a day in August in which the testimony as to what the two drivers did immediately. preceding the collision and as to whether the collision occurred on the north or south side of the road was in conflict, the questions of defendant's negligence and of plaintiff's contributory negligence were ones of fact for the jury.

2. APPEAL AND ERROR—AUTOMOBILES—CONTRIBUTORY NEGLIGENCE—CONFLICTING TESTIMONY—PHYSICAL FACTS.

Supreme Court cannot say plaintiff was guilty of contributory negligence as a matter of law in action by westbound motorist against owner of eastbound truck on a highway 20 feet wide in broad daylight at a place where parties had a view of each other for several hundred feet where the testimony as to what the respective drivers did immediately before the accident and as to which side of the road the collision took place was in conflict.

3. SAME—ADMISSION OF EVIDENCE—LOCATION OF CARS AFTER ACCIDENT.

In action for injuries arising from collision between two motor vehicles travelling in opposite directions, admission of testimony as to position of the two vehicles and defendant's truck dump box after the accident and as to the location of oil marks on the pavement *held*, not sufficiently prejudicial to warrant the granting of a new trial, where such testimony was admitted without objection and such parts as were objectionable were stricken by the court.

4. EVIDENCE—FAILURE TO PRODUCE—PRESUMPTIONS.

Failure to produce evidence within a party's control raises the presumption that, if produced, it would operate against him; and every intendment will be in favor of the opposite party.

5. APPEAL AND ERROR—FAILURE TO CALL EYEWITNESS—ARGUMENT OF COUNSEL—INSTRUCTIONS.

In action for injuries arising from collision between plaintiff's car and defendant's truck in which plaintiff, defendant's

---

Function of court and jury on issue of contributory negligence, see 2 Restatement, Torts, § 476 and also § 285. As to withdrawal of case from jury, see 2 Restatement, Torts, § 285 and comment (e).

truck driver, and another person who had been employed by defendant before the accident and thereafter, but not on day of accident, were the only eyewitnesses, comment by plaintiff's attorney that plaintiff and defendant's truck driver were called to the stand and then observing defendant's failure to produce third witness and court's instruction that such witness was present in the court room on the day of the trial, that he was available to either party by process of the court, and that counsel for either party had the right to make such proper comments on the failure to call such third witness as the facts warranted did not constitute reversible error.

6. AUTOMOBILES—SPEED—TESTIMONY BY ONCOMING MOTORIST.

In action by motorist who claimed he had observed defendant's oncoming truck for about a quarter of a mile on a straight highway paved 20 feet wide, it was not error to permit plaintiff to testify as to the speed of the truck immediately preceding the accident which occurred shortly after noon late in August.

7. APPEAL AND ERROR—MOTION FOR NEW TRIAL—EVIDENCE.

On appeal from denial of motion for new trial Supreme Court reviews record to determine whether verdict is so contrary to the great weight of the evidence as to disclose an unwarranted finding or that jury apparently disregarded its duty of giving due consideration to evidence as a whole.

8. SAME—MOTION FOR NEW TRIAL—REVIEW OF ALL EVIDENCE.

On review of denial of motion for new trial Supreme Court confines itself to a comprehensive review of all the evidence, having in mind the burden of proof and, according due allowance to the jury's advantage in facing the witnesses, determines from the record whether or not the verdict is so plainly a miscarriage of justice as to call for a new trial, not whether there was evidence sufficient to take the case to the jury.

9. NEW TRIAL—CORRECTING VERDICT.

If verdict is against clear weight of evidence, it is duty of judge to correct it on motion for new trial.

10. AUTOMOBILES—VERDICTS—CONFLICTING EVIDENCE.

In action for injuries arising from accident between car and a truck travelling on the same road in opposite directions, evidence, though conflicting, *held*, sufficient to justify jury's verdict for plaintiff.

11. DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT.

Verdict of $13,000 for 51-year-old plaintiff with life expectancy of 20.2 years who earned from $100 to $200 a month at his

trade as a cement finisher *held*, not excessive in view of about $1,600 medical and hospital expenses, loss of earnings, pain and suffering from injuries and subsequent operation, leg, chest, arm, and head injuries resulting in permanent impairment of use of right arm and verdict was not obtained by improper methods, prejudice or sympathy.

12. SAME—PERSONAL INJURIES.

There is no absolute standard by which the amount of damages in personal injury cases can be measured and the amount allowed for pain and suffering must rest in the sound judgment of the trier of the facts.

13. SAME—EXCESSIVE VERDICTS.

Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive.

14. APPEAL AND ERROR—VERDICTS AND FINDINGS—PREJUDICE—SYMPATHY.

The Supreme Court does not usually substitute its judgment for that of a jury in a personal injury action unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy.

Appeal from Gogebic; Landers (Thomas J.), J. Submitted April 10, 1942. (Docket No. 69, Calendar No. 41,948.) Decided May 18, 1942.

Case by Mike Gibbons against Delta Contracting Company, a Michigan corporation, for damages for personal injuries sustained in a motor vehicle collision. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Wm. G. Cloon*, for plaintiff.

*E. W. Massie*, for defendant.

STARR, J. This case involves plaintiff's claim for damages resulting from an automobile collision which occurred sometime between 12:30 and 1:15 on

the afternoon of August 22, 1940, on highway US-2 about one mile west of the village of Watersmeet, Gogebic county.

At the place of collision US-2 was a 20-foot cement paved highway extending east and west in a practically straight line. The view was clear for about 1,000 feet to the east and 500 to 600 feet to the west. Both drivers were familiar with the road at the point of the accident. The weather was clear. It had rained earlier in the day, and there was testimony that the pavement was "wet" or "slightly damp."

Plaintiff, a cement finisher, was alone in his 1930 Chevrolet sedan and was driving west on US-2. An employee was driving defendant's truck east on US-2. The truck had an empty dump box attached. Both vehicles were proceeding on their own respective sides of the highway until within 50 or 60 feet of the place of collision, which occurred on US-2 at or near the point where a private road, known as the Pat Kelly road, coming from the south, ran into but did not cross US-2. The only eyewitnesses to the accident were plaintiff, defendant's driver, and another employee of defendant (not working that day) who was riding with defendant's driver.

Plaintiff sustained severe injuries and was removed to the hospital in an unconscious condition. He was confined in hospitals for about six months and underwent three operations including a bone grafting. At the time of the trial, about nine months after the accident, he had not recovered the use of his right arm; and medical testimony indicated that the injuries to his right arm were permanent.

On September 18, 1940, plaintiff began suit alleging that he was driving west on the right (north) side of US-2; that, when defendant's truck, ap-

proaching from the west on the south side of the road, was about 60 feet from plaintiff's car, the truck turned sharply to the left (north) across the highway and collided with plaintiff's car on the *north side* of the highway. Defendant's answer denied negligence on its part and alleged that plaintiff was guilty of contributory negligence. It further alleged that its driver was proceeding east on the south side of the highway, that plaintiff turned his car to the left (south) directly into the path of defendant's truck, and that the accident occurred on the *south side* of the highway.

The case was tried before a jury. Motion for directed verdict made at the conclusion of plaintiff's proofs and renewed at the conclusion of all proofs was denied. The jury returned a verdict of $13,000 for plaintiff. Defendant's motion for new trial was denied.

Defendant appeals, contending that its driver was not negligent; that plaintiff was guilty of contributory negligence as a matter of law; that the trial court erred in the admission of testimony and in his instructions to the jury; that the court erred in permitting plaintiff's counsel to make prejudicial remarks in his argument to the jury; that the verdict was against the great weight of the evidence; and that the verdict was grossly excessive.

Plaintiff was employed by defendant in connection with a road construction project about a mile from the place of the collision. He had not worked the morning of the day the accident occurred. About noon defendant had notified him to ''hurry up to go to work, * * * to straighten up around forms and get ready to pour concrete.'' Plaintiff was driving his own car on his way to work for defendant when the accident happened. In regard to the collision, plaintiff testified, in part:

"*Q.* At the time the truck and the car came together, at what rate of speed were you driving your car?

"*A.* 18 to 20 miles an hour.

"*Q.* Could you see the truck coming?

"*A.* Yes, I seen the truck for nearly quarter of mile.

"*Q.* From the time you first saw the truck to the time the truck hit you, did the truck change its speed?

"*A.* Not that I notice, keep the same speed.
*   *   *

"*Q.* What rate of speed would you say that truck was traveling?

"*A.* I would say traveling about 50 or 60.   *   *   *

"*Q.* What side of the road were you on when you were hit?

"*A.* I was on my right-hand (north) side of the road.   *   *   *

"*Q.* Tell us how the accident happened?

"*A.* Well, maybe 50 or 60 feet from me when the truck turned to my side of the road and run across center line and hit right in angle in front.

"*Q.* Where were you with respect to Kelly's driveway when you got hit—was it east or west of it?

"*A.* West of Kelly's driveway, about 60 or 65 feet."

Defendant's driver presents an entirely different version of the accident. He testified, in part:

"*Q.* At that time what were you doing?

"*A.* I was driving east to town for another load of aggregate.   *   *   *

"*Q.* And did you see a car coming from the opposite direction?

"*A.* I did.

"*Q.* How far away were you from that other car when you first saw it, Mr. Foster?

"*A.* I would say I seen that car over 1,000 feet.

"*Q.* Which side of the road was that car on when you first saw it?

"*A.* The other car was on the north side of the road. * * *

"*Q.* As you approached the intersection, tell the jury what occurred. * * *

"*A.* He (plaintiff) attempted to turn into this Kelly driveway * * *

"*The Court: Q.* Tell what he did.

"*The Witness: A.* He turned into this driveway and came down the highway on the south side of the road and then—

"*Mr. Massie: Q.* On your side of the road?

"*A.* On my side of the road and then started to swing for the north line.

"*Q.* And where did this collision take place, Mr. Foster?

"*A.* It was approximately from 30 to 40 feet west of the Kelly driveway.

"*Q.* On which side of the road, the north side or the south side?

"*A.* On the south side. * * *

"*Q.* You say he turned into—appeared to turn into the Kelly driveway—at that time how far were you from him when he started to make that turn to the south side of the road?

"*A.* I should judge it would be 50 or 60 feet. * * *

"*Q.* Did he give any signal or anything that he was going to turn to the south side of the road?

"*A.* No.

"*Q.* Now after—did you do anything to attempt to avoid colliding with him? * * *

"*A.* I swung to the left (north) to avoid hitting this car directly. * * *

"*Q.* How fast was his (plaintiff's) car going?

"*A.* He was going about the same speed I was. * * *

"*Q.* That would be how fast?

"*A.*. 30 or 35. * *

"*Q.* Then, as he turned to the south, describe the course of his car before the collision.

"*A.* Well, before the collision he was driving, that would be, he would be going west on the south side of the road. * * *

"*Mr. Massie:* Q. And then what did he do, trace his course?

"*A.* And after he was a little bit past the intersection (of Pat Kelly road), I swung to the north, headed toward the center line to avoid him. That is where the impact took place.

"*Q.* Where did the two cars come together with reference to the Kelly driveway?

"*A.* Approximately 50 feet west. * * *

"*The Court:* Q. What parts of the car and truck struck?

"*A.* The right part of the truck collided with the right part of the car. * * *

"*Q.* Now, Mr. Foster, after the collision, what occurred to your truck, what happened? * * *

"*A.* After the two cars came together, the car was on the south side, Gibbons was on the south side, facing Watersmeet. * * *

"*Q.* Where was your car?

"*A.* The truck was almost parallel with the Kelly driveway, and the front portion was over the center line. * * *

"*Q.* Did you see this man (plaintiff) stick out his left arm, indicating he was going to turn into Kelly's driveway?

"*A.* No, I didn't.

"*Q.* Did he blow his horn?

"*A.* No.

"*Q.* Did you apply your brakes before this collision occurred?

"*A.* Yes, I did. * * *

"*Q.* Your truck came to rest on the cement, isn't that correct?

"*A.*   Yes.

"*Q.*   Your front wheels were knocked entirely off your truck, is that correct?

"*A.*   Underneath the truck.   *   *   *

"*Q.*   The oil came out of your truck onto the cement?

"*A.*   Yes.   *   *   *

"*Q.*   Your truck that you were driving and that metallic box would weigh more than three tons, wouldn't it?   *   *   *

"*A.*   I would say that truck would weigh about 6,500.   *   *   *

"*Q.*   You gave no signal at any time when you were driving your truck, by horn or hand?   *   *   *

"*A.*   No.   *   *   *

"*Mr. Massie:*   Q.   How far did your truck go after the collision with Gibbons' car?

"*A.*   Approximately 15 to 20 feet."

The testimony was in conflict as to the location of defendant's truck after the accident.   Some witnesses testified that the truck was entirely on the north side of the pavement, while others stated that the truck was headed in a northeasterly direction with the front part over the center line on the north side and the back part south of the center line. Some witnesses testified that there was oil from the truck on the north side, but not on the south side, of the pavement; also, that there were scratches on the north side of the pavement, apparently caused by the front portion of the truck sliding on the pavement after the wheels were knocked off.   Other witnesses did not see the oil or the scratches on the north side of the pavement.   Several witnesses testified that there was broken glass from plaintiff's car on the south side of the pavement.   The dump box on the truck was knocked off and came to rest on the south side of the pavement.   A witness tes-

tified that he picked up plaintiff's glasses in a case "on the south edge of the pavement."

Plaintiff had held a driver's license for about seven years, but it had expired and at the time of the accident he had a driver's permit, issued by the sheriff's office, pending receipt of new license. The new license received by plaintiff a few days after the accident had "a check on it regarding vision." He was not wearing his glasses at the time of the accident.

One of defendant's witnesses, a State police officer who interviewed plaintiff in the hospital the next day after the accident, testified:

"*Q.* How did he tell you this accident happened?

"*A.* I asked him what occurred out there and he said he had attempted to make a left-hand turn into the Kelly driveway to park his car and that he misjudged the speed of the truck coming toward him, rather he misjudged the distance the truck was away from him at the time he made the turn."

Another witness for defendant who visited plaintiff in the hospital a week or two after the accident testified:

"*Q.* What did Mike (plaintiff) tell you as to the circumstances under which this accident happened at that time?

"*A.* Mike said he got into the path of this oncoming truck, on the wrong side of the road, and before he could pull out of the way, get his car shifted into another gear—he mentioned the fact an old car didn't have much pickup—why an impact occurred and he did not have time to jump."

Plaintiff denied making such statements to the police officer and another witness.

The conflicting testimony in this case presents issues of fact as to what the two drivers did imme-

diately preceding the collision and as to whether the collision occurred on the north or the south side of the road. Because of such conflicting testimony the questions of defendant's negligence and of plaintiff's contributory negligence were ones of fact for the jury. *Essmeister* v. *Roadway Transit Co.*, 275 Mich. 387; *Wilson* v. *City of Detroit*, 299 Mich. 473.

After a careful study of the conflicting testimony of the two drivers and other testimony as to the circumstances and physical facts of the collision, we cannot say that plaintiff was guilty of contributory negligence as a matter of law.

Defendant contends the trial court erred in admitting certain testimony as to the position of the two vehicles and the truck dump box after the accident, and as to the location of the oil marks on the pavement. The record indicates that most of such testimony was admitted without objection by defendant, and such parts as were objectionable were stricken by the court. We do not find error in the admission of testimony sufficiently prejudicial to warrant the granting of a new trial.

It appears from the record that one Louis Dain, who was employed by defendant but who was not working on the day of the accident, was riding in defendant's truck at the time of the collision. Dain was in the court room during the course of the trial but was not called as a witness by defendant. Defendant claims error by the trial court in permitting plaintiff's counsel, in his argument to the jury, to make "prejudicial statements" regarding defendant's failure to call Dain as a witness. Defendant also alleges error in the court's instruction to the jury regarding the statements made by plaintiff's counsel.

In his argument to the jury plaintiff's counsel stated:

"There were three witnesses, three possible witnesses to this accident, the driver of the defendant's truck, the plaintiff and Louis Dain, who was riding with the driver of the defendant's truck. We produced the plaintiff and he testified as to how this accident happened and the defendant's truck driver testified but how about this third man—why didn't they produce him? This man, Dain, who was riding in the truck with Foster at the time the collision occurred—why didn't Mr. Massie call Dain for the defendant?"

The court's instruction to the jury was as follows:

"There was some mention made during the argument and trial of the case as to a witness, Dain. There has been some reference to one Louis Dain, as riding in defendant's truck at the time of the collision; that he worked for the defendant the day before the accident and prior thereto and the day after the accident and subsequent thereto; about a month before and about a month after the accident, but not the day of the accident; that he was in the court room at least during part of the trial. You are charged that either party had the right to call Louis Dain as a witness, he being available to the process of this court, Dain being a resident of Watersmeet, Gogebic county, Michigan. You are further charged that counsel for either party to this litigation had the right to make such proper comments on the failure to call Louis Dain as the facts warranted."

In *Brandt* v. *C. F. Smith & Co.*, 242 Mich. 217, 222, Mr. Justice NORTH said:

"Failure to produce evidence within a party's control raises the presumption that, if produced, it would operate against him; and every intendment will be in favor of the opposite party. *Cole* v. *Railway Co.*, 81 Mich. 156; *Griggs* v. *Railway Co.*, 196 Mich. 258."

We are satisfied that the argument by plaintiff's counsel and the court's instruction as above quoted did not constitute reversible error.

There was no error as claimed by defendant in permitting plaintiff to testify as to the speed of defendant's truck immediately preceding the accident.

Defendant further contends that the verdict was contrary to the great weight of the evidence. In considering this contention we are guided by the statement of Mr. Justice WIEST in *Patterson* v. *Thatcher*, 273 Mich. 597, 600:

"The jury weighs the evidence, it is true, but upon review, under the allegation that the verdict rendered is against the weight of the evidence, we examine the record and determine whether the verdict is so contrary to the great weight of the evidence as to disclose an unwarranted finding. We may disagree with the finding but such alone is not the test for our finding must be an apparent disregard by the jury of due consideration of the evidence as a whole. * * *

"We confine ourselves to a comprehensive review of all of the evidence, having in mind the burden of proof and according due allowance to the advantage had by the jury in facing the witnesses, and from the record determine whether or not the verdict is so plainly a miscarriage of justice as to call for a new trial. See *In re McIntyre's Estate*, 160 Mich. 117; *People* v. *Spencer*, 199 Mich. 395, 400. Evidence sufficient to take the case to the jury is not the test. *Crippen* v. *Chatterton*, 228 Mich. 532. It is only in such a case that the review mentioned is to be had."

In the present case there was testimony which, if believed by the jury, would justify their verdict. In *Fabbro* v. *Soderstrom*, 252 Mich. 455, 458, we said:

"The jury is the trier of the facts. If their verdict is against the clear weight of the evidence, it is

the duty of the trial judge to correct it. He has an opportunity to do so in passing on a motion for a new trial. When he has weighed the evidence and approved of the verdict, this court will not disturb it unless there are very clear reasons for doing so. The consideration which this court will give to his judgment is well stated in applicable language by Justice FELLOWS in *Pachuczynski* v. *Railway,* 202 Mich. 594:

" 'But in the determination of the question in this court it must be borne in mind that this court is not the trier of the facts. We cannot invade the province of the jury. It must also be kept in mind that the trial judge heard and saw the witnesses, was in a position to judge of their credibility and their mental capacity; that the presumption that he correctly measured them must be considered, and that we may not set aside a verdict unless it is manifestly against the clear weight of the evidence.' "

From a thorough study of the conflicting testimony we are convinced that the verdict was not against the great weight of the evidence.

Defendant's final contention is that the verdict of $13,000 was grossly excessive. At first impression such verdict might appear excessive. But when we consider the medical and hospital expenses necessarily incurred by plaintiff, his loss of earnings, his long period of hospitalization, his pain, suffering, and permanent injuries, such verdict loses its appearance of excessiveness.

Plaintiff was 51 years old at the time of the accident and had worked at his trade as a cement finisher for over 25 years. He testified, in substance, that when the accident occurred, he was making $200 per month at his trade and that in the winter time he would make "better than $100 a month on pickup jobs." His life expectancy was 20.2 years. In the collision plaintiff sustained a brain concussion, laceration of the head, laceration of the right

knee involving the kneecap and exuding the joint fluid, a fracture of the left kneecap, multiple cuts, contusions and bruises, chest injury, and dislocation and compound fracture of the right elbow with the "two bones extended right out to the open surface, and loss of tissues and nerve injury." Plaintiff developed pneumonia after his removal to the hospital. The testimony indicates that plaintiff suffered a great deal of pain from his injuries and subsequent operations. He was confined in the hospital in Ironwood from August 22 to September 14, 1940, when he went to the Marquette hospital for bone surgery. He was confined in the Marquette hospital from September 15 to October 25, 1940, and from November 6, 1940, to March 9, 1941. He underwent three operations including a bone grafting in his arm. His hospital and medical bills amounted to $1,594.80.

At the time of the trial, about nine months after the accident, plaintiff had not sufficiently recovered to return to work, and there was medical testimony indicating that he would probably not be able to do work requiring the use of his right arm for at least an additional year. The doctor who examined plaintiff when he was first removed to the hospital at the time of the accident and who again examined him about the time of the trial testified, in part, that plaintiff's right arm was "permanently disabled" and that he did not think plaintiff would "ever be able to use his right arm for common labor." Another doctor who attended plaintiff in the hospital and who examined him about the time of the trial testified that plaintiff had recovered from his knee, head, and chest injuries and that his "right elbow * * * is only about 10 per cent. useful at present. * * * It will never be a good elbow." There was other medical testimony indicating that plaintiff's

right arm would continue to improve but was permanently injured.

When the medical and hospital expenses and plaintiff's loss of earnings are deducted from the amount of the verdict, the balance does not seem excessive for plaintiff's pain, suffering, and permanent injuries. There is no showing that the verdict was obtained by improper methods, prejudice or sympathy. In *Cleven* v. *Griffin*, 298 Mich. 139, 141, Mr. Justice BOYLES said:

"No claim is made that the verdict was obtained by improper methods, prejudice or sympathy. There is no absolute standard by which we can measure the amount of damage in personal injury cases. The amount allowed for pain and suffering must rest in the sound judgment of the triers of the facts. *Watrous* v. *Conor*, 266 Mich. 397; *Weil* v. *Longyear*, 263 Mich. 22. Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive. *Cawood* v. *Earl Paige & Co.*, 239 Mich. 485. We do not usually substitute our judgment for that of the jury unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy."

We are convinced that the jury's verdict is amply supported by the testimony and is not excessive.

The judgment is affirmed, with costs to plaintiff.

CHANDLER, C. J., and BOYLES, NORTH, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.